715 A.2d 1082

**STONEHEDGE SQUARE LIMITED PARTNERSHIP, Appellee,**

v.

**MOVIE MERCHANTS, INC., d/b/a Movie Merchants, Appellant.**

Supreme Court of Pennsylvania.

Argued Feb. 4, 1998.

Decided July 21, 1998.

Jordan D. Cunningham, Edwin A.D. Schwartz, Harrisburg, for Movie Merchants Inc.

George B. Faller, Jr., Thomas G. Collins, Carlisle, for Stonehedge Sq. Ltd. Partnership.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION OF THE COURT

FLAHERTY, Chief Justice.

The issue in this case is whether the landlord in a commercial lease is required to mitigate its damages when its tenant has breached the lease agreement by moving out before the end of the lease term.

Stonehedge Square Limited Partnership owns and operates a shopping center in Carlisle, Cumberland County, Pennsylvania. Stonehedge originally entered into a five year lease with General Video Corporation. The lease began on July 6, 1990 and ended on July 6, 1995. On July 31, 1992, General Video assigned its rights, duties and liabilities under the lease to Movie Merchants, Inc., which operated a video rental store on the premises from July of 1992 through October 27, 1994.

On or about August 25, 1994, Movie Merchants discussed with Stonehedge the possibility of terminating its lease prior to the expiration of the remaining term of the lease. Stonehedge listed the premises for rent, but was unable to find a tenant. Movie Merchants expressed a desire to buy out the lease, but no agreement could be reached as to a buyout amount. Stonehedge indicated to Movie Merchants that until a tenant could be secured, Movie Merchants was liable on the lease. On approximately October 27, 1994 Movie Merchants vacated the leasehold and failed to pay any rent thereafter.

Stonehedge then sued for rent due under an acceleration clause in the lease, seeking unpaid rent from November 1, 1994 to July 5, 1995. The case was tried without a jury, and on August 11, 1995, the court returned a verdict in favor of Stonehedge and against Movie Merchants in the amount of

$46,797.09, plus interest. Movie Merchants excepted to the verdict and the trial court reversed itself, holding that the landlord had a duty to mitigate damages. Consequently, the court ordered a new trial on the issue of damages. Both parties appealed and the Superior Court reversed the order for a new trial and reinstated the original verdict in favor of Stonehedge. We granted the petition for allowance of appeal, limited to the issue of whether the Superior Court's reliance on our decision in *Auer v. Penn*, 99 Pa. 370 (1882), was proper. We now affirm.

Prior to the thirteenth century, leases were used for two purposes: to lend money and to facilitate the working of the land of prominent landowners. The first use of the lease, as a money lending device, originated as a way to avoid the ecclesiastical ban on usury. The borrower-landowner would receive money from the lender and would allow the lender to utilize his land for a certain period of time, presumably to grow crops.[1] Subsequently, the money lending function fell into disuse and the agricultural lease, which was simply a device to provide a labor source for the production of crops, became prominent. In neither case was the tenant regarded as having

1. Pollock and Maitland note that besides leases, mortgages were also used to secure loans. The term *mort gage* [dead gage] is our modern "mortgage," and Pollock and Maitland point out that the gage of land is closely connected to the lease for years:

> The notion expressed by the word [gage] seems to be that expressed by our "security"; something has either been given or been seized, and the possession of it by him in whose hands it now is, secures the payment of money or the performance of some act by the person by whom it was given or from whom it was taken. But it is the given gage of land that concerns us now.
>
> Such transactions had long been known. We read of them in some of the Anglo–Saxon land-books, and it is highly probable that in England as elsewhere we might from a very early age distinguish several different methods by which land was made to serve as a security for money lent. We seem to see the conveyance which is subject to a condition, *also the beneficial lease for years which enables a lender to satisfy himself by taking the fruits of the land,* also a form of gage which does not set off the fruits against the debt. . . . Before the end of the twelfth century very large sums of money had been lent upon gage.

II *History of English Law*, II, Ch.IV § 5, 117–18 (Cambridge, 1899)(Emphasis added).

an interest in the land. Both of these leases were important because they may have influenced the way in which early common law courts viewed tenants, viz., as having an action available on the contract, but no possessory action which would be dependent on the conveyance of an interest in the land. Thus, prior to the thirteenth century at common law, the tenant's interest in the land was personal and contractual, not a real property interest protected by a recovery of possession.

Between the thirteenth and sixteenth centuries, lessees gradually came to be regarded as holding an interest in the land and entitled to a possessory action. In fact, for purposes of giving the tenant a remedy to recover possession, the land interest came to be regarded as the only interest possessed by the lessee; the lease was regarded as essentially a conveyance rather than a contract.

In the last 150 years, the pendulum has begun to swing back so that contractual elements have once again assumed a role of importance in leases. A primary factor influencing this development is the urbanization of the population and the growth of cities, shifting the focus in leasing from land to the buildings on the land. Complexities in modern life and the increased importance of structures as opposed to the land itself commonly have been handled by provisions in leases. 2 *Powell on Real Property* § 16.02(1)(a).

Thus, in modern landlord-tenant law, leases have a dual nature, both as conveyances of protected property interests and also as contracts. Because of this historical background in which leases are sometimes viewed as conveyances and sometimes as contracts, problems in leases may be resolved either by principles of property law or by principles of contract law.

At common law, the mitigation of damages in a lease was regarded as being controlled by property law. Because the lease was a conveyance of real property, the tenant owned a non-freehold estate, and the landlord had no duty to mitigate damages arising from the tenant's breach of the lease. It was

of no concern to the landlord whether the tenant chose to occupy the property or not. Cribbet, *Principles of the Law of Property*, p. 190 (Mineola, 1975). This was so in spite of the fact that it is a general principle of contract law that the non-breaching party to a contract has the duty to reduce his damages, if he can reasonably do so. Restatement of Contracts 2d, § 350. Nonetheless, Pennsylvania has followed the common law view that a non-breaching landlord has no duty to mitigate damages where the tenant has abandoned the property in breach of the lease.

In 1882 this court held that "if the relation of landlord and tenant was not ended by contract, he was not bound to rent to another during the term for relief of the defendant." *Milling v. Becker*, 96 Pa. 182 (1880). Two years later, in *Auer v. Penn*, this court held that "[t]he landlord may allow the property to stand idle, and hold the tenant for the entire rent; or he may lease it and hold him for the difference, if any." *Id.*, 99 Pa. 370, 375–76 (1882). And in 1928 this court held that "[r]eletting is not imposed on a landlord as a duty." *Ralph v. Deiley*, 293 Pa. 90, 141 A. 640, 643 (1928).

The issue becomes, then, whether we should now modify the rule of these cases. Movie Merchants argues that a lease is in the nature of a contract and is controlled by principles of contract law.[2] Further, it argues that the common law rule leads to unfair results, encourages waste, imposes penalties, and fosters bad public policy. Movie Merchants argues that although leases traditionally have been regarded as conveyances of land, modern leases are an exchange of promises, and contract law has long recognized the duty of a non-breaching party to mitigate damages.

Stonehedge, on the other hand, argues that the Pennsylvania rule should continue in effect because precedent requires it, because to require the landlord to mitigate damages would reward the breaching tenant for his breach, and because the

---

**2.** In *Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897, 903 (1979), this court held that in a case involving the implied warranty of habitability, a lease is in the nature of a contract and is controlled by principles of contract law.

requirement of mitigation would place an onerous burden on the nonbreaching landlord, denying him the benefit of his bargain.

■ We agree with Movie Merchants that certain aspects of leases are controlled by the law of contracts and that insofar as the law of contracts is applicable, the non-breaching party must mitigate his damages. In the *Pugh* case, supra, for example, the lease was construed as a contract; however, *Pugh* deals only with the issue of whether there is an implied warranty of habitability in a residential lease, and, therefore, offers us no guidance on the question of mitigation of damages.

■ For the following reasons, we now hold that a nonbreaching landlord whose tenant has abandoned the property in violation of the lease has no duty to mitigate damages.

First, this rule is firmly established in Pennsylvania. As the *Auer* court stated:

> Nothing is better settled in Pennsylvania than that a tenant for years cannot relieve himself from his liability under his covenant to pay rent by vacating the demised premises during the term, and sending the key to his landlord.

99 Pa. at 375. Leases have been drafted and bargained for in reliance on this rule. Business decisions and structured financial arrangements have been made with the expectation that this rule, which has been the law, will continue to be the law.

Second, the established rule has the virtue of simplicity. If the landlord is required to relet the premises, there is unlimited potential for litigation initiated by the tenant concerning the landlord's due diligence, whether the landlord made necessary repairs which would be required to rent the premises, whether the landlord was required to borrow money to make repairs, whether the landlord hired the right agents or a sufficient number of agents to rent the premises, whether the tenants who were refused should have been accepted, and countless other questions in which the breaching tenant is permitted to mount an assault on whatever the landlord did to

mitigate damages, alleging that it was somehow deficient. This potential for complexity, expense, and delay is unwelcome and would adversely affect the existing schema utilized to finance commercial development.

Third, the Landlord and Tenant Act of 1951, Act of April 6, 1951, P.L. 69, art. I § 101 et seq., 68 P.S. § 250.101 et seq., which is a comprehensive regulatory scheme governing the landlord and tenant relationship, does not modify the landlord's duty to mitigate damages as it had been established in our cases.

Fourth, there is a fundamental unfairness in allowing the breaching tenant to require the nonbreaching landlord to mitigate the damages caused by the tenant. This unfairness takes the form of depriving the landlord of the benefit of his bargain, forcing the landlord to expend time, energy and money to respond to the tenant's breach, and putting the landlord at risk of further expense of lawsuits and counterclaims in a matter which he justifiably assumed was closed.

Fifth, in this case, the tenant was in a position to mitigate his own damages. The lease provides:

26. ASSIGNMENT AND SUBLETTING

The Tenant shall not, and shall not have the power to, transfer, assign, sublet, enter into license or concession agreements, change ownership, mortgage or hypothecate this Lease or the Tenant's interest in and to the Demised Premises without first procuring the written consent of the Landlord which Landlord may withhold in Landlord's sole discretion, not to be unreasonably withheld.

Thus, the tenant could have provided the landlord with a sublessee and the landlord had a duty not to unreasonably withhold consent. It seems self-evident that in choosing between requiring the non-breaching party and the breaching party to mitigate damages, the requirement, if any, should be placed on the breaching party, as it has been for centuries.

Order of the Superior Court is affirmed.

ZAPPALA, J., files a concurring opinion in which NEWMAN, J., joins.

CAPPY, J., files a concurring opinion.

ZAPPALA, Justice, concurring.

I concur in the result. However, I do not believe this is an appropriate case to reach the issue of whether a commercial landlord is generally required to mitigate damages. Since the grant of allocatur was limited to that issue, I suggest that the more prudent course would be to dismiss the appeal as improvidently granted.

As the majority notes, this action was based on an acceleration clause in the lease. The parties thus provided in the lease for their respective rights, obligations, and remedies in the event of a breach.[1] Under the terms of the lease, the landlord may relet the premises, but is not obligated to do so. Accordingly, this case does not present the issue that the majority decides, whether the common law should require a landlord to mitigate damages.

NEWMAN, J., joins this Concurring Opinion.

CAPPY, Justice, concurring.

I join in the majority's opinion, but write separately to emphasize that the majority's statement that "the tenant was in a position to mitigate his own damages [as it had the ability to sublease]" is not controlling in this matter. Majority op. at 418, 715 A.2d at 1085. I believe that such an observation

---

1. Paragraph 42 of the lease states the landlord's rights in the event of a default. It appears to set the amount of liquidated damages at 25% of the remaining installments of rent (remaining installments of rent less "the fair rental value of the premises," fair rental value being defined as "seventy-five percent of the minimum rent provided in Paragraph 5.") The landlord is also entitled to recover, among other things, the minimum rent, additional rent, and other costs due under the lease, "less net rent, *if any,* actually collected by the Landlord on reletting" ¶ 42(3)(emphasis added). These latter amounts are payable on the days they would have been payable had the lease not been terminated. It is not clear whether the verdict of $46,797.09 plus interest was based on this formula, but it does not appear that this amount was ever challenged on appeal.

merely recognizes the facts of this case, and shows that this particular tenant had within its hands the power to minimize its loss due to breach of the lease. In my opinion, a tenant's ability to sublease, and thus reduce its liability for breaching the lease, is of no import: whether the tenant had such a power or not, the landlord would not be under a duty to mitigate damages.