**Hirsh v. Carbon Lehigh Intermediate Unit #21**

C.P. of Lehigh County, no. 2002-C-2043.

*Steven A. Bergstein,* for plaintiff.
*Kevin Charles-Reid,* for defendant.

BLACK, *J.,* December 5, 2003—Now, December 5, 2003, following trial without jury and oral argument, the court finds in favor of plaintiff, Steven J. Hirsh, against the defendant, Carbon Lehigh Intermediate Unit #21, in the amount of $468,947.44, plus interest at the rate of six percent per annum on the amount of $427,734.44 only from September 14, 2001, based on the following findings of fact and conclusions of law:

## FINDINGS OF FACT

(1) Plaintiff, Steven J. Hirsh (landlord), is the owner of a one-story multi-use commercial building located at 7580 Kernsville Road, Lowhill Township, Lehigh County, Pennsylvania.

(2) Defendant, Carbon Lehigh Intermediate Unit #21 (tenant), is a legal entity formed pursuant to the laws of the Commonwealth of Pennsylvania, consisting of 14 member school districts in Carbon and Lehigh Counties.

(3) On August 20, 1999, landlord and tenant entered into a written lease agreement[1] for tenant to occupy approximately 5,000 square feet of space in landlord's aforesaid commercial building (the leased premises) for use as a public school facility known as the Lehigh Learning Adjustment School for special needs students in the member school districts.

---

1. Plaintiff's exhibit 2.

(4) The lease was for a term of 10 years commencing October 1, 1999, or upon approval of the leased premises for use as a school or for educational requirements by the Pennsylvania Department of Labor and Industry and the Pennsylvania Department of Education, should those approvals occur at a later date.

(5) The lease called for landlord to make improvements to the leased premises in accordance with specifications provided by tenant so that the leased premises would be suitable for a school. The specifications were prepared by tenant and incorporated into the lease. Landlord was to pay the cost of the improvements, and the rent was based in part on these projected costs.

(6) The specifications did not include air conditioning. Landlord had offered to install air conditioning so long as the rent was increased to cover the extra cost, but tenant declined this proposal.

(7) Landlord completed the renovations in accordance with the specifications prior to the commencement date of the lease at a cost to landlord in excess of $100,000.

(8) Tenant took possession of the leased premises on or about January 1, 2000, and commenced operation of its Lehigh Learning Adjustment School on the site at that time.

(9) The lease provided in paragraph 33:

"By taking possession, Tenant shall be deemed to have accepted the leased premises and to have acknowledged that the same are in the condition called for hereunder." [2]

---

2. *Id.*, 20.

(10) In November 2001, tenant discovered mold in part of the leased premises, and notified landlord of this condition.

(11) At tenant's suggestion, landlord agreed that Jeffrey Miller of J. Miller & Sons Inc., be brought in to evaluate this condition. Mr. Miller took air samples in early November to assess the air quality. After testing the samples he reported on November 12, 2001, that the mold count in the utility room was high and that the leased premises should be vacated until remediation could be done.

(12) On November 13, 2001, tenant temporarily vacated the leased premises until the remediation could be completed. Classes were moved temporarily to other locations.

(13) Mr. Miller successfully completed the remediation by November 20, 2001, and reported at that time that the leased premises were safe for occupancy.

(14) Tenant resumed occupancy of the leased premises a week later, on November 27, 2001, after the Thanksgiving holiday weekend.

(15) Mr. Miller performed additional air quality tests in December 2001. These tests confirmed that the remediation was successful.

(16) Landlord's property insurance carrier denied coverage of his claim for payment of Mr. Miller's invoice for services on the ground that coverage was not provided under landlord's policy for damage resulting from mold.

(17) In March 2002, tenant received complaints from staff members that mold had recurred in several places in the building.

(18) Tenant did not notify landlord of these complaints. Instead, without informing landlord, tenant hired Mr. Miller to perform a "complete professional and environmental study at the Lehigh Learning Adjustment School for the purpose of determining the probability of an occurrence of mold contamination."[3] Mr. Miller's proposal stated, "The study will be completed and prepared for future use in a legal proceeding."[4]

(19) Mr. Miller's firm engaged Robert Pfromm, a certified industrial hygienist with the firm of A2SI, and James Kern, a structural engineer of the firm of QproQ Engineering Inc., to assist in the study.

(20) Mr. Pfromm performed an indoor air quality assessment of the leased premises on April 24, 2002. He concluded that the prior remediation effort by Mr. Miller was "largely successful," but that "the building due to its design, construction and ventilation system deficiencies continues to have fungal contamination problems as well as serious ventilation deficiencies."[5] He found the building "in its present state (as of the April 24, 2002 assessment) to be unsuitable for use as a school building, primarily due to the ventilation deficiencies and the fungal contaminants."[6]

(21) Mr. Pfromm was unable to identify the source of the fungal contaminants. He observed mold in only one room, the mental health office, on the inside of a cement block exterior wall above the suspended ceiling.

---

3. Plaintiff's exhibit 9.
4. *Id.*
5. Defendant's exhibit 12A, 6-7.
6. *Id.*, 7.

(22) Mr. Pfromm made a number of recommendations in his report to improve the air quality in the building. These included finding and removing the source of the fungal contaminants and correcting the conditions that allowed their growth; installing a forced air ventilation system with the highest efficiency filters to be replaced on a regular schedule; using only HEPA filtered vacuum cleaners; and correcting problems with the fuel tank base. He recommended that tenant discontinue use of the building if the corrective action he proposed was not accomplished.

(23) James Kern reported various concerns with the building construction, but he did not recommend that tenant discontinue use of the building. His recommendation was that there be inspections by the Pennsylvania Department of Labor & Industry, the Pennsylvania Department of Environmental Protection, and the municipal building inspector to verify compliance with the applicable codes.[7]

(24) Mr. Miller submitted his report to tenant on May 15, 2002. The findings and recommendations of Mr. Pfromm and Mr. Kern were included as part of that report. In section V of his report Mr. Miller concluded that problems associated with the fuel tank must be corrected, and that the air quality situation "will not improve until an HVAC system is installed and the moisture problem [on the back wall of the structure] is corrected."[8] He opined that "if the structural and environmental problems are not attended to immediately, the use of the struc-

---

7. Defendant's exhibit 12B, 2.
8. Plaintiff's exhibit 8.

ture as a school should be terminated as soon as a suitable alternative building can be located."[9]

(25) Tenant did not inform landlord of the findings and recommendations of Pfromm, Kern and Miller, and their recommendations were not implemented.

(26) Instead, in June 2002, without advance notice to landlord, tenant's board of directors voted to terminate the lease as of the end of that month.

(27) On June 18, 2002, tenant's counsel on behalf of tenant sent a letter to landlord advising landlord that tenant was terminating the lease effective June 30, 2002.[10] Tenant's letter cited problems with the oil tank, the presence of mold, and an inadequate ventilation system as the reasons for termination.

(28) Shortly thereafter, between June 18 and June 30, 2002, tenant vacated the premises.

(29) Since June 2002 tenant has not paid any rent under the lease and has not occupied the leased premises.

(30) Under paragraph 9 of the lease, tenant was obligated to keep the premises "in a clean and safe condition."[11]

(31) Under paragraph 10 of the lease, tenant had the right to make additions or alterations to the premises subject to landlord's approval, which was not to be unreasonably withheld.[12]

(32) Prior to tenant's letter of June 18, 2002, except for the mold problem of November 2001, which was

---

9. *Id.*
10. Plaintiff's exhibit 6.
11. Plaintiff's exhibit 2, 7.
12. *Id.,* 7-8.

promptly and successfully remediated, tenant had not advised landlord of any complaints about the leased premises. Tenant had never informed landlord of any problems with the oil tank and had not complained about mold except for the November 2001 episode.

(33) Tenant's representative discussed with landlord the desirability of adding air conditioning at various times after its occupancy commenced. However, tenant was fully aware of the lack of air conditioning when it signed the lease and understood that the cost of adding a new HVAC system would have to be absorbed by tenant through an increase in its rent.

(34) Tenant did not provide landlord with a copy of Mr. Miller's report until after tenant had vacated the leased premises.

(35) Tenant did not provide landlord with notice of and an opportunity to cure the deficiencies referred to in Mr. Miller's report.

(36) Landlord responded to tenant's termination letter with his letter of August 15, 2002, in which he declared the lease terminated as of August 20, 2002, instructed tenant to surrender the premises, and stated that the rent acceleration clause was in effect.[13]

(37) Paragraph 22(a) of the lease grants landlord the following remedies upon tenant's default:

"Landlord shall have, in addition to all other rights and remedies available to it by law or equity, the option to pursue any one or more of the following remedies: (1) terminate this lease on three days written notice to Tenant and, upon the date specified in such notice to Tenant,

13. *Id.,* 15.

this lease and all rights of Tenant hereunder shall expire and terminate, and Tenant shall thereupon surrender the premises to Landlord in the condition required herein, and Tenant shall *remain* liable to Landlord as herein provided; (2) to declare, upon written notice to Tenant, all sums for rent and other charges that may be due under this lease, and for the balance of the term hereof, immediately due and payable." [14] (emphasis in original)

(38) Paragraph 23 of the lease provides that these remedies are cumulative:

"All the remedies hereinabove given to the Landlord and remedies given to him by law and equity shall be cumulative and concurrent. No termination of this lease or the taking or recovering of the premises shall deprive Landlord of any of his remedies or actions against the Tenant for rent due at the time or which, under the terms hereof, would in the future become due as if there had been no termination, nor shall the bringing of any action for rent or breach of covenant, or the resort to any other remedy herein provided for the recovery of rent be construed as a waiver of the right to obtain possession of the premises." [15]

(39) Landlord did not intend by his letter of August 15, 2002, to release tenant of its obligations under the lease for future rent.

(40) The accelerated rent for the balance of the lease term amounts to $446,081.50.

(41) Under paragraph 25 of the lease, tenant was obligated to restore the leased premises upon termination "in as good condition as when tenant entered into pos-

---

14. *Id.*
15. *Id.,* 16.

session, reasonable wear and tear excepted, and damage by unavoidable casualty excepted to the extent that the same is covered by Landlord's fire insurance policy . . . ."[16]

(42) Tenant failed to restore the leased premises to the condition required by paragraph 25 of the lease.

(43) The fair and reasonable cost of restoring the leased premises to this condition was $11,113.00.

(44) Landlord made demand for payment of this sum in his letter of August 15, 2002, but payment has not been made.

(45) On November 26, 2002, landlord sent a second letter to tenant through his counsel, notifying tenant that landlord had secured another tenant for the leased premises and that the rents from this new tenant would reduce landlord's damage claim against tenant.[17]

(46) The new tenant, Image Works, began occupying the leased premises on December 1, 2002, but was granted a rent abatement for the first two months and a rent reduction for the next five months because of renovations it was making to the leased premises. The reduced rent schedule was as follows:

| Month | Rent Due |
| --- | --- |
| February 2003 | $1,533 |
| March 2003 | $1,666 |
| April 2003 | $1,799 |
| May 2003 | $1,933 |
| June 2003 | $2,066 |
| July 2003-September 2003 | $2,200 |

16. *Id.*, 17.
17. Plaintiff's exhibit 4.

(47) The new lease with Image Works is a month-to-month lease.

(48) Before taking possession, Image Works made some renovations to the leased premises, including the removal of one bathroom, the removal of some interior partition walls, the addition of doors, and a new electrical system.

(49) The leased premises could be returned to their condition of June 2002 within 30 days, if tenant desired to reoccupy the space.

(50) Landlord acknowledged in his letter of November 26, 2002, that the rent to be paid and renovations done by Image Works would mitigate to some extent the amount due from tenant to landlord under the lease. This mitigation is in the amount of $15,597.

(51) Landlord's re-entry and re-letting of the leased premises to Image Works were for the purpose of protecting the property and mitigating the damages from tenant's breach of lease.

(52) The parties have stipulated that tenant's security deposit of $2,650.06 shall be credited against any amount the court finds due from tenant to landlord under the lease.

(53) Counsel fees reasonably incurred by landlord in pursuing its lease remedies amount to $30,000.

## CONCLUSIONS OF LAW

(1) Tenant breached the lease by declaring in its letter of June 18, 2002, that it was terminating the lease, effective June 30, 2002, and by failing to pay any rent thereafter.

(2) Tenant did not have a valid reason for terminating the lease.

(3) The occurrence of mold, though an uninsured condition, did not entitle tenant to terminate the lease under paragraph 19, which pertains to damage by fire or other casualty. The occurrence of mold in this case did not cause the leased premises to be totally or partially destroyed. Moreover, the mold problem was caused in large part by tenant's decision not to install an HVAC system in the initial build-out of the leased premises, as landlord had suggested; and landlord was never notified and given a reasonable opportunity to correct the condition.

(4) Tenant was not entitled to terminate the lease on the ground that landlord breached an implied warranty of habitability because (a) there is no such warranty in commercial leases, (b) tenant did not notify landlord of the alleged defects and give landlord a reasonable opportunity to correct the same; and (c) tenant is responsible in large part for the mold condition because of its decision not to install an HVAC system in the initial build-out.

(5) Tenant was not entitled to terminate the lease under the principle set forth in the Restatement (Second) of Property §5.4 because (a) tenant did not notify landlord of the alleged defects and give landlord a reasonable opportunity to correct the same; and (b) tenant is responsible in large part for the mold condition because of its decision not to install an HVAC system in the initial build-out.

(6) The surrender of leased premises may only be accomplished by the agreement of all parties to the lease agreement. Unless the landlord accepts the tenant's surrender of the premises, the surrender does not terminate the tenant's obligations under the lease.

(7) Whether there has been an acceptance of a tenant's surrender is primarily a question of the landlord's intention.

(8) The tenant has the burden of proving an acceptance of surrender by clear and convincing evidence.

(9) Landlord's letter of August 15, 2002, was not an acceptance of surrender because it did not manifest an intention on the part of landlord to release tenant from further obligations under the lease.

(10) A landlord's re-entry and re-letting of leased premises after a tenant has unilaterally vacated is not an acceptance of surrender if the landlord's purpose is to protect the property and/or to mitigate the damages from the tenant's breach of lease.

(11) Landlord's re-entry and re-letting of the leased premises to Image Works were for the purpose of protecting the leased premises and mitigating the damages from tenant's breach of lease.

(12) The renovations done by Image Works are not so inconsistent with the lease as to amount to an acceptance by landlord of tenant's surrender of the leased premises.

(13) The lease, in paragraphs 22 and 23, permits landlord to seek alternative remedies in the event of tenant's default, including repossession of the leased premises as well as accelerated rent for the balance of the term. However, landlord may not both exclude tenant from possession and collect accelerated rent.

(14) A landlord of a commercial lease does not have a duty to mitigate his damages upon the tenant's default.

(15) To the extent a landlord receives mitigation, the defaulting tenant is entitled to credit.

(16) Tenant is entitled to a credit against its liability for future rents for any mitigation received by landlord, both past and future, from Image Works or other tenants of the premises during the balance of the lease term.

(17) The amount of landlord's mitigation from February 2003, through September 2003, is $15,597, for which tenant is entitled to a credit.

(18) Tenant's security deposit of $2,650.06 is also to be credited against tenant's liability under the lease.

(19) Under paragraph 22(d) of the lease,[18] landlord is entitled to reimbursement from tenant of counsel fees reasonably incurred by landlord in proceedings to enforce the lease.

(20) Landlord is entitled to recover from tenant the following:

| | |
|---|---|
| Accelerated Rent | $ 446,081.50 |
| Repairs | $ 11,113.00 |
| Landlord's Reasonable Counsel Fees | $ 30,000.00 |
| Subtotal | $ 487,194.50 |
| Less Mitigation Received through 9/30/03 | $ 15,597.00 |
| Less Tenant's Security Deposit | $ 2,650.06 |
| Principal Amount Due as of 9/30/03 | $468,947.44 |

(21) Under paragraph 22(c) of the lease,[19] landlord is entitled to interest on overdue rent at the rate of six percent per annum commencing 30 days after the due date. Therefore, interest accrues on the accelerated rent (less the credits) from September 14, 2002, this being 30 days after the date of acceleration.

---

18. Plaintiff's exhibit 2, 16.
19. *Id.*, 15.

(22) Under paragraph 22(d) of the lease,[20] interest on the repairs and counsel fees does not accrue until the date of payment by landlord. Since there is no evidence that landlord has paid these items, no interest is due thereon.

(23) The total amount due from tenant to landlord is $468,947.44, plus interest on $427,734.44 from September 14, 2002.

(24) Upon payment of the aforesaid amount due, tenant shall be entitled to receive from landlord all rent and other consideration received by landlord from the use of the leased premises during the balance of the lease term.

(25) Upon payment of the aforesaid amount due, tenant shall be entitled (a) to re-enter the leased premises and/or (b) to assign or sublease the premises for its benefit with landlord's consent to the assignment or sublease, such consent not to be unreasonably withheld.

## DISCUSSION

A lease imposes obligations on both parties. It may not be rescinded by the decision of one party alone. Thus, a tenant cannot relieve itself of the obligation of paying rent by simply vacating the premises during the lease term and notifying the landlord that the lease is terminated. Yet that is precisely what tenant has attempted in this case. Tenant vacated the premises and with its letter of June 18, 2002, declared the lease terminated as of June 30, 2002. This unilateral attempt to terminate the lease was ineffective.

---

20. *Id.,* 16.

Defendant contends that it was entitled to terminate the lease because of the presence of mold and other deficiencies of the leased premises. In the alternative, tenant argues that there was a surrender and acceptance of the leased premises, thereby terminating tenant's obligations under the lease. Tenant also disputes landlord's right to accelerate the rent for the balance of the term since landlord has re-entered and re-let the leased premises to a third party, who has made some interior alterations. We have concluded that none of these arguments has merit.

## I. Tenant's Default

Tenant notified landlord by its letter of June 18, 2002, that it was terminating the lease, effective June 30, 2002, because of "the pervasive nature and extensiveness of these structurally caused non-covered casualties."[21] The letter describes these "casualties" as follows:

"The CLIU has been advised that the design and construction of the building as well as the ventilating systems of the leased premises are such that the existence of fungal contamination is a reoccurring [sic] phenomenon in the structure. As a result, overall air quality is not suitable on an ongoing basis for a school.

"Additionally, the CLIU has been advised that the oil fired system used to heat the premises has no ability to supply fresh air to occupied spaces and that there is no spill contamination system for the oil tank. The fuel tank is presently leaking and the type, location and shape of the tank are questionable. The CLIU has also been advised that the bank is sitting on a large block of expanded

21. Plaintiff's exhibit 6.

polystyrene which is structurally inappropriate and not properly ventilated."[22]

Significantly, tenant never notified landlord of any of these alleged defects prior to sending the termination letter. Thus, landlord was never given the opportunity to address these conditions. As a result, even if we were to find landlord responsible for these conditions, they cannot support tenant's unilateral lease termination.

## A. The Claim of an Uninsured Casualty

Tenant contends that mold is not covered by landlord's insurance policy, and therefore that tenant is entitled under paragraph 19 of the lease to terminate the lease upon 60 days' written notice to landlord. Paragraph 19, entitled "Damage by fire or other casualty," establishes the rights and obligations of the parties "[i]n the event that the leased premises is partially destroyed by fire or other casualty . . . ."[23] The language relied on by tenant is as follows:

"It is agreed, however that if Landlord's property shall be totally destroyed, or shall be extensively damaged by an insured casualty that the damage cannot be repaired within 120 days from the date of such occurrence, or if the fire or other casualty is not covered under Landlord's insurance policy, Landlord or Tenant may at their election terminate this lease upon written notice given within 60 days after such occurrence. . . ."[24]

---

22. *Id.*
23. Plaintiff's exhibit 2, 11.
24. *Id.,* 12.

We do not believe that the appearance of mold at the leased premises can be considered the total destruction of the property or extensive damage to the property by a casualty, within the meaning of paragraph 19. Mold may affect air quality, but the small amount observed at the leased premises did not destroy or damage any part of the physical structure itself. Therefore, paragraph 19 has no application to this case. Tenant's reliance on this paragraph is misplaced.

Clearly, the parties could not have intended that the mere presence of mold would give either of them a right to terminate the lease. If that interpretation were to be adopted, no lease would be safe because the appearance of mold is a very common occurrence in buildings. That is the very reason why most property insurance policies contain exclusions for mold. The provisions in paragraph 19 are very typical in commercial leases; and since insurance coverage cannot usually be obtained for mold, tenant's interpretation of this paragraph is tantamount to a warranty by landlord that mold will not appear on the premises. This is not a reasonable interpretation of the lease.

Moreover, tenant's experts identified the lack of an HVAC system as a principal factor in the occurrence of the mold. Since tenant was offered such a system as part of the initial build-out, but declined because of the extra cost, tenant cannot now use the occurrence of mold as a basis for terminating the lease.

## B. The Implied Warranty of Habitability

Tenant next contends that its actions were justified because the mold and other conditions of the property breached landlord's implied warranty of habitability. This contention is without merit for several reasons. First, there is no such warranty in a nonresidential lease. Tenant relies on the case of *Pugh v. Holmes,* 486 Pa. 272, 405 A.2d 897 (1979), where the Pennsylvania Supreme Court established an implied warranty of habitability in residential leases. However, this doctrine has never been extended to a commercial lease, such as the lease in this case.

Tenant asks the court to extend the doctrine of implied warranty to this case because the leased premises were to be used as a school for children. We decline to do so because the basic rationale of *Pugh* simply does not apply. The decision in *Pugh* was based on a finding that residential tenants are at a distinct disadvantage in negotiating lease terms, and that their inferior bargaining power often compels them to accept substandard living conditions. The situation here is completely different. Tenant was represented by legal counsel in negotiating the lease; tenant provided the language for the lease as well as the specifications for the leasehold improvements to be made by landlord; tenant was well aware of the design and construction of the building; and tenant has acknowledged that the leasehold improvements were completed in accordance with its specifications. The issue of warranties in such a case is best left for negotiation between the parties, rather than imposition by judicial fiat. The parties were free to negotiate

whatever warranties they felt were appropriate. In such a case there is no need to impose any implied warranties.

Furthermore, even if we were to extend the doctrine of implied warranty of habitability in this case, tenant could not rely on it. The Supreme Court expressly stated in *Pugh* that "to assert a breach of the implied warranty of habitability, a tenant must prove he or she gave notice to the landlord of the defect or condition, that he (the landlord) had a reasonable opportunity to make the necessary repairs, and that he failed to do so." *Id.* at 290, 405 A.2d at 906.

Tenant, by its own admission, did just the opposite. Instead of giving notice to landlord of the alleged defects and giving landlord a reasonable opportunity to make any necessary repairs, tenant deliberately kept landlord in the dark. Tenant arranged for inspections of the property and received expert reports with recommendations, but never shared any of this information with landlord. It is difficult to avoid the conclusion that tenant was deliberately concealing the problems from landlord so that landlord would not take corrective action, thus allowing tenant to use these problems as an excuse for terminating the lease. There was no justification for secret inspections and secret reports. Without giving landlord notice and a chance to correct the problems, tenant is in no position to claim a breach of a warranty of habitability.

There is another reason why such a warranty does not apply here. The leased premises were improved pursuant to *tenant's* specifications. The principal reason for the air quality problem is the lack of an HVAC system. Such a system was offered to tenant before and during

the construction of the leasehold improvements. Tenant declined to include such a system because the extra cost would have been amortized as additional rent over the term of the lease. Therefore, if the lack of an HVAC system has rendered the building "uninhabitable," it would be manifestly unfair to hold landlord responsible for this condition.

## C. Restatement (Second) of Property §5.4

Tenant also relies on section 5.4 of the Restatement (Second) of Property, which addresses the remedies available where an unsuitable condition arises after a tenant has entered into possession of real estate. This section provides:

"Except to the extent the parties to a lease validly agree otherwise, there is a breach of the landlord's obligations if, after the tenant's entry and without fault of the tenant, a change in the condition of the leased property caused by the landlord's conduct or failure to fulfill an obligation to repair, or caused suddenly by a non-manmade force, makes the leased property unsuitable for the use contemplated by the parties *and the landlord does not correct the situation within a reasonable time after being requested by the tenant to do so.*" (emphasis added)

The Pennsylvania courts have not specifically adopted this section of the Restatement, but it appears to be a sound principle of law. In this case, however, it clearly does not apply. Tenant has acknowledged that it never notified landlord of any of the problems alleged in its letter of June 18, 2002. The only notice of a mold problem was in November 2001, at which time the problem was promptly addressed and remedied. As noted above,

for reasons that have never been satisfactorily explained, tenant arranged for inspections and tests by outside experts without informing landlord, and then instead of asking landlord to correct the problems, tenant proceeded unilaterally to vacate the premises and terminate the lease. Hence, tenant cannot rely on section 5.4 of the Restatement.

Also, this section requires that the unsuitable condition be "without fault of the tenant." Here it is tenant's decision not to include an HVAC system in its specifications for the initial build-out of the leased premises that contributed substantially to the problem complained of. This is an additional reason why section 5.4 does not apply.

For these reasons, tenant had no legal justification for walking away from the lease. By its letter of June 18, 2002, purporting to terminate the lease and by its failure to pay any rent after June 2002, tenant has defaulted on the lease.

## II. The Claim of Surrender and Acceptance

Tenant next contends that it has been released from any obligations under the lease by virtue of the doctrine of surrender and acceptance. The Pennsylvania Supreme Court has held that where a tenant surrenders leased property to the landlord prior to expiration of the lease term, and the landlord accepts the surrender of the premises, the tenant's liability under the lease for further rent terminates. *Ralph v. Deiley*, 293 Pa. 90, 141 A. 640 (1928). This doctrine is analogous to the concept of rescission by mutual consent under contract law.

Tenant states that its letter of June 18, 2002, announcing that it was terminating the lease, was a surrender of the premises to landlord, and that landlord's response by its letter of August 15, 2002, was an acceptance of the surrender. Specifically, tenant relies on the first paragraph of landlord's letter, which states:

"Please be advised that, pursuant to our lease agreement, paragraph 22(a), I hereby declare the lease agreement between us terminated as of August 20, 2002 (must be three days after receipt) at which time this lease and all of your rights in said property shall expire and terminate and you shall surrender the premises to me in good condition as required under the lease."

Tenant's argument has a certain surface appeal, but it does not withstand analysis. Surrender and acceptance is a question of the intent of the parties.

"When the lessee quits the premises with an intention to give up all rights to them, and to disengage himself from liabilities springing from the contract of lease, to make his effort effectual he must procure the lessor's assent . . . ." *Ralph, supra* at 93-94, 141 A. at 642.

The tenant has the burden of proving the lessor's assent by clear and convincing evidence. *Stonehedge Square Limited Partnership v. Movie Merchants Inc.,* 454 Pa. Super. 468, 475, 685 A.2d 1019, 1023 (1996), *affirmed,* 552 Pa. 412, 715 A.2d 1082 (1998). In this case landlord's letter of August 15, 2002, does state in the first paragraph that the lease is terminated and calls for tenant to "surrender the premises . . . ." However, the letter goes on to demand accelerated rent for the balance of the term. Such a demand is completely inconsistent with an acceptance of the proffered surrender. Therefore,

upon reading the letter in its entirety, one cannot conclude that the landlord intended to release tenant from further obligations under the lease. Had landlord intended to do so, the letter would not have contained a demand for accelerated rent.

Tenant also contends that landlord's actions in re-letting the leased premises to Image Works, which made some interior alterations, was an implied acceptance of the surrender. Surrender may be implied when supported by evidence of actions of the landlord that would be inconsistent with the continuation of the lease. *Ralph, supra* at 94, 141 A. at 642. Nevertheless, if after a tenant vacates, the landlord enters the premises to protect the property, or even if the landlord sublets the premises for the tenant's benefit to mitigate the damages, this is not a sufficient basis for implying an acceptance of the surrender of the lease. Such actions are not necessarily inconsistent with the continued viability of the landlord's claims against the tenant under the lease.

"After a tenant vacates the property leased, the landlord has the right to reenter and take such steps as may be necessary and proper towards subletting the premises." *Kahn v. Bancamerica-Blair Corp.,* 327 Pa. 209, 214, 193 A. 905, 907 (1937).

The question again is one of intent, *i.e.,* whether the landlord's actions manifested an intent to accept a surrender of the lease, thereby releasing the tenant from any liability for future rent. *Stonehedge Square Limited,* 454 Pa. Super. at 475, 685 A.2d at 1023.

In this case landlord's re-letting of the leased premises to Image Works was not adverse to tenant. On the contrary, as landlord pointed out in its letter of Novem-

ber 26, 2002, the rent received from Image Works would reduce landlord's damage claim against tenant. Since tenant had vacated the premises and indicated it was not going to return, it was to both parties' advantage that a new tenant be obtained.

It should be noted that a landlord does not have a duty to mitigate damages under a commercial lease. *Stonehedge Square Limited Partnership v. Movie Merchants Inc.,* 552 Pa. 412, 715 A.2d 1082 (1998). However, a landlord cannot be faulted for seeking to secure a new tenant to minimize the loss. Indeed, as a matter of sound public policy, landlords should be encouraged to make efforts to re-let premises where the tenant has vacated. It benefits no one for the property to lie fallow and unused. A re-letting of the property benefits both landlord and tenant, as well as third parties who may have a use for the property. Therefore, a court should not be quick to imply an acceptance of surrender from a re-letting of the premises. Such a conclusion should be reached only if the landlord's actions are a clear manifestation of his intent to end the first lease.

In this case the re-letting was on a month-to-month basis with the new tenant making easily reversible interior alterations. If tenant should have a change of heart and wish to resume occupancy, this can be accomplished within 30 days. Thus, the re-letting for tenant's benefit is not inconsistent with the continued viability of the lease. Nothing landlord has done clearly manifests an intent to release tenant from further obligations under the lease.

Accordingly, landlord has not accepted a surrender of the lease. The lease continues to be binding on both landlord and tenant.

### III. Damages

Landlord seeks accelerated rent for the balance of the term as well as attorney fees, the cost of repairing the premises, and interest. Landlord acknowledges that tenant is entitled to credits for the security deposit and for the proceeds from landlord's re-letting of the premises.

Tenant contends that since landlord has re-taken possession of the premises, the claim for accelerated rent conflicts with a well-established principle that a landlord cannot obtain a double recovery, *i.e.,* both possession of the premises and accelerated rent for the balance of the term. *Homart Development Co. v. Sgrenci,* 443 Pa. Super. 538, 662 A.2d 1092 (1995). As the Superior Court stated in *Homart:*

"It is a basic tenet of our system of civil justice that a plaintiff may not obtain a double recovery for a single wrong . . . ." *Id.,* 443 Pa. Super. at 555, 662 A.2d at 1100.

The court noted that a double recovery was precisely what the plaintiff had obtained by way of two confessed judgments, one for possession of the leased premises and another for accelerated rent for the balance of the lease term. The court held that "a landlord must elect whether to confess judgment for possession and for all monies then due, or to confess judgment for all monies due for the entire term. . . . The landlord, however, cannot, as it did in the instant case, enter judgment for possession and for all moneys which would otherwise be due as rents through the end of the term." *Id.,* 443 Pa. Super. at 557-58, 662 A.2d at 1101.

Landlord seeks to distinguish *Homart* on the ground that the case involved confessed judgments. However,

this is not a meaningful distinction. The principle of law remains the same, whether or not judgment has been confessed: a landlord may not exclude the tenant from possession of the leased premises and at the same time recover accelerated rent for the full balance of the term. If accelerated rent is paid, the tenant is entitled to possession of the premises for the balance of the term. Conversely, if the tenant is ejected from the premises prior to expiration of the term, then the landlord is not entitled to rent for the unexpired balance. *Grakelow v. Kidder,* 95 Pa. Super. 250 (1928).

Nor can *Homart* be distinguished on the ground that the lease between landlord and tenant, in paragraphs 22 and 23, explicitly authorizes cumulative remedies, including termination of the lease and the collection of accelerated rent. The lease in *Homart* contained very similar language. It is clear from *Homart* that the language of a lease cannot trump the overriding principle that there shall be no double recovery.

Lease provisions authorizing cumulative remedies are very common. They are a relic of former pleading practices. The proper interpretation of such provisions is summarized in Ronald M. Friedman, Pennsylvania Landlord Tenant Law and Practice (Bisel 3d ed. 2003), at page 98, as follows:

"The existence of cumulative remedies does not mean that the landlord, the tenant or any litigant ultimately can obtain in court two inconsistent remedies for one breach. For example, the landlord cannot have a judgment for money damages for unpaid rent of that remaining lease term and be entitled to a judgment in ejectment as well. Likewise, after a judgment in ejectment is en-

tered, the landlord cannot continue to claim rent under the lease agreement. Cumulative remedies provide a means of *seeking* alternative remedies, not *enforcing* inconsistent remedies." (emphasis in original)

The important distinction between *Homart* and the instant case is that tenant here has voluntarily relinquished possession of the property to landlord. Landlord has not sought judicial intervention to exclude tenant from the premises and is not seeking any such relief. Also, landlord has agreed to credit against the accelerated rent any rents that landlord is able to obtain from third parties for use of the leased premises while tenant is out of possession. In these circumstances there is no reason to be concerned about a double recovery. Landlord is not asking the court to award him both possession and accelerated rent. He seeks a judgment only for the accelerated rent and other damages. He has re-entered and re-let the property not to exclude tenant, but for the purpose of protecting the property and mitigating the damages.

We are well aware that there is an internal inconsistency in landlord's letter of August 15, 2001, in which he demands a surrender of the premises in the first paragraph and then demands accelerated rent in the very next paragraph. The question remains whether this letter excluded tenant from possessing the leased premises. This is a close question, but looking at the situation realistically, we believe it did not. Tenant had already vacated the premises of its own volition, stating in its letter of June 18, 2001, that it was terminating the lease. Tenant has made no request to return. Thus, we believe that the first paragraph of landlord's letter was not tantamount to an eviction. It did not cause tenant to leave the leased

premises or to remain out of possession. Accordingly, landlord's claim for accelerated rent does not represent a double recovery and is valid.

In reaching this conclusion, we have taken into consideration the public policy referred to earlier in favor of encouraging landlords to re-let vacant properties. As we noted, although a landlord in a commercial lease does not have a legal *duty* to mitigate damages by re-letting the property after a tenant vacates, it is certainly desirable from the standpoint of both landlord and tenant that mitigation efforts be made. It is also in the public interest that vacant properties be re-let instead of remaining idle. Therefore, where a defaulting tenant has voluntarily vacated leased premises without judicial compulsion, and the landlord then re-enters and re-lets the property to mitigate his loss, the landlord should not be penalized by a forfeiture of future rents under the lease unless it is clear that the collection of these rents will lead to a double recovery. There is no evidence of a double recovery here.

For all the foregoing reasons, we find that landlord is entitled to a judgment against tenant in the amount of $468,947.44 for accelerated rent, repairs and attorney fees, as itemized in conclusion of law no. 20, plus interest at the rate of six percent per annum on the balance due for accelerated rent only.