J-A11022-18

2018 PA Super 228

| | | |
|---|---|---|
| ALICE DAVIS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BOROUGH OF MONTROSE | : | |
| | : | |
| Appellant | : | No. 1210 MDA 2017 |

Appeal from the Judgment Entered August 30, 2017
In the Court of Common Pleas of Susquehanna County Civil Division at
No(s): 2014-168 C.P.

| | | |
|---|---|---|
| ALICE DAVIS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BOROUGH OF MONTROSE | : | No. 1250 MDA 2017 |

Appeal from the Judgment Entered August 30, 2017
In the Court of Common Pleas of Susquehanna County Civil Division at
No(s): 2014-168 C.P.

BEFORE:   STABILE, J., NICHOLS, J., and PLATT J.[*]

OPINION BY NICHOLS, J.:                    **FILED AUGUST 13, 2018**

Appellant/Cross-appellee Borough of Montrose (Borough) appeals from the judgment entered awarding $99,989.81 in damages for breach of contract in favor of Appellee/Cross-appellant Alice Davis (Landlord). Borough claims that the trial court erred in barring the testimony of three of Borough's witnesses, in failing to credit its defense of impossibility of performance, and

_____

[*] Retired Senior Judge assigned to the Superior Court.

in awarding Landlord damages when Landlord did not give Borough an opportunity to resume the lease. Landlord cross-appeals claiming that the trial court erred in its calculation of damages and in denying pre-judgment interest. We vacate the judgment, affirm in part and reverse in part the order denying Landlord's post-trial motion, affirm the order denying Borough's post-trial motion, and remand for further proceedings as set forth below.

The trial court set forth the following finding of facts:

1. On December 21, 2012, [Landlord] and [Borough] entered into a lease agreement for property located at 4 Mill Street in the Borough of Montrose, Susquehanna County, Pennsylvania [(the property or the building)].

2. The lease was for a five (5) year term and provided that [Borough] pay $59,940 annual rent, payable in monthly installments of $4,995. The lease also provided that, in addition to rent, [Borough] was responsible to pay all real estate taxes, all insurance on the premises, utilities, and any and all maintenance, upkeep, and repairs.

3. Other than several members of Borough Council doing a "walk through" prior to signing the lease, [Borough] did not conduct any inspections of the property.

4. [Borough] accepted the keys to the property on or about January 1, 2013 but never used the building for any purpose.

5. The building had been previously used as a gym/fitness center and contained a small swimming pool for water aerobics. The building also houses a small apartment, not included in the lease, which [Landlord] rents separately, and which was occupied during the term of the lease.

6. In March of 2013, [Borough] tested the building and found mold. In June, [Borough] drained the swimming pool. The property was retested in July and August of 2013 and mold was again found to be present.

7. [Borough] notified [Landlord] of the mold findings sometime in August of 2013.

8.  Thomas Lamon[t], President of Borough Council, had a few casual discussions with [Landlord] about remediation of the mold between August and October of 2013.

9.  In early November of 2013, [Borough] advised [Landlord] by mail that it was terminating the lease as of December 31, 2013 due to the presence of mold in the building.

10. After receiving [Borough]'s notice, [Landlord] hired Flood Pros of NY, LLC to conduct successful mold remediation in the building. [Landlord] did not advise [Borough] of this result. [Landlord] also did repairs and alterations to the building.

11. [Landlord] contacted a realtor in January, 2014 to place the building back on the rental market; however, remediation and renovations were not complete until September of 2014. [Landlord] then signed a listing agreement on September 23, 2014 with a rental price of $3,995 per month.

12. Meanwhile, on February 12, 2014, [Landlord] had filed the subject Complaint against [Borough] for breach of the lease agreement. [In Borough's answer, it included as new matter the defense of impossibility of performance and asserted that Landlord fraudulently represented there was no mold in the building prior to entering into the lease].

Trial Ct. Op. & Verdict, 4/28/17, at 1-2 (unpaginated).

Prior to trial, Landlord filed motions *in limine* seeking to exclude expert and fact witnesses from testifying for Borough. **See generally** Landlord's Mot. *in Limine* to Exclude Testimony of Tenant's Expert Witness, 6/27/16; Landlord's Mot. *in Limine* to exclude Testimony of Witnesses Identified Eight Days Prior to Trial, 9/29/16. Specifically, Landlord sought to exclude testimony of a recently disclosed expert, Gary Lyons,[1] who, according to

_____

[1] Borough initially identified its proposed expert as "Gary Johnson" in a September 23, 2016 letter. During trial, however, Borough clarified that the expert's correct name is Gary Lyons. **See** N.T., 10/4/16, at 10.

- 3 -

Borough, would opine that the mold existed in the building before the lease was entered into by the parties. Landlord's Mot. *in Limine* to Exclude Testimony of Tenant's Expert Witness, 6/27/16, at ¶ 19. Additionally, Landlord sought to preclude four fact witnesses—Jason Beardsley, Jean Pierce, Bernard Bell, and Jeffrey Strohl from testifying.[2] **See generally** Landlord's Mot. *in Limine* to exclude Testimony of Witnesses Identified Eight Days Prior to Trial, 9/29/16. Landlord asserted that these fact witnesses should be precluded from testifying because Borough failed to identify the witnesses or the substance of their testimony in response to Landlord's interrogatories.[3] **Id.** at ¶ 9-11, 16.

On October 4th and 5th, 2016, the trial court conducted a bench trial. At the outset of trial, the trial court denied Landlord's motions *in limine,* but explained that it would "sort things out as [they] come[] in." **See** N.T., 10/4/16, at 2.

Landlord testified at trial in support of her position that Borough breached the lease and presented evidence regarding her damages, including, the lease, the invoice from Flood Pros—the mold remediation company, utilities bills, etc. **See generally** N.T., 10/4/16, at 15-93; N.T., 10/5/16, at 15-19. Landlord also admitted the deposition testimony of Kevin Telfer, owner

---

[2] The Borough did not call Bernard Bell or Jeffrey Strohl to testify at trial, and they are not relevant to the instant appeal.

[3] Landlord did not seek to exclude the testimony of Kenneth DiPhillips, whom Borough listed as a witness in response to Landlord's interrogatories.

of Flood Pros, who was hired by Landlord to perform mold remediation. **See** Dep. of Kevin Telfer, 8/17/16, at 2. In his deposition, Telfer described the procedure employed in performing the mold remediation in the building. **See generally id.** Telfer also stated that the mold issue was remediated and the work completed by December of 2013. **Id.** at 10.

Borough, in relevant part, called Richard Tarnowski as an expert in mold testing. N.T., 10/4/16, at 117. Tarnowski testified that he was contacted by Borough to create a protocol for mold remediation. **Id.** at 122. Tarnowski stated that, on July of 2013, he conducted a visual inspection and identified areas in the building with elevated moisture levels. **Id.** at 128. He testified that he "found elevated moisture levels pretty much everywhere, which isn't unusual. They had an indoor swimming pool, so we kind of suspected that there could be some moisture issues." **Id.** at 130. He further noted that "the construction of the building was at a lower grade than the road level. So in our opinion, in looking at some of my photos, we had moss growth and mold growth and sediment placed at the front of the building, which is most likely from runoff of the road." **Id.** Tarnowski explained that "the building condition certainly could lead to continued mold problems if they weren't remediated." **Id.**

Tarnowski testified that every area of the carpeting that he checked had elevated mold levels, that dehumidifiers were not present on site the day he visited, and that there was standing water in the pool. **Id.** at 131. Further, there was moisture behind the metal panels where the insulation was located.

*Id.* He continued that he could not recall if he saw visible signs of mold in the carpeting, but that he saw visible signs of mold in the HVAC[4] ductwork, in the pool room, in the sauna room, and on wood door surfaces in the offices. *Id.* at 133.

Borough called Jean Pierce, who was one of the subjects of Landlord's motion *in limine*, to testify. *Id.* at 169. Landlord objected to Pierce's testimony regarding the condition of the building before the lease because she was not identified in a timely manner and Landlord did not know what Pierce was going to testify to or the basis for her conclusions. *Id.* at 169-170. The trial court deferred ruling on Landlord's objection and permitted her to testify. *Id.* at 170.

Pierce thereafter testified that she taught exercise and aerobic classes at the property prior to the lease. *Id.* at 172. She stated that there were "a great deal of problems" with the pool area, including too many chemicals in the pool and the smell being so strong because there was nothing to circulate the air. *Id.* at 172-74. She further made observations as to there being "black mold" on some of the steps leading to the second floor. *Id.* at 175. Pierce explained that she complained to Landlord about the chlorine smell in the pool area but not about the existence of mold. *Id.* at 175-76.

Upon cross-examination, Pierce acknowledged that she has never been employed in the field of mold remediation. *Id.* at 177-78. She also

_____

[4] Heating, ventilation, and air conditioning.

acknowledged that she never knew of any testing performed that revealed the presence of mold. *Id.* at 178.

Borough called Jason Beardsley, who was also one of the subjects of Landlord's motion *in limine*. N.T., 10/5/16, at 2. At the outset of Beardsley's testimony, Landlord similarly requested a continuing objection for the same reasons she had set forth during her objection to Pierce's testimony. *Id.* Beardsley then testified that during the period of 2002 and 2003, he worked at the gym located in the property. *Id.* at 3. He testified that his job was primarily as a "desk attendant" and that he would "also be responsible for making sure that any rubbish was cleaned up and -- you know -- cleaning down, you know, wiping down machines that had gotten sweat on them or any other substance." *Id.* at 4. He stated that he observed "mold everywhere," and that he would try to "scrub it off the walls." *Id.* at 5, 8.

On cross-examination, Beardsley acknowledged that he had no training on mold remediation or identification. *Id.* at 10. He stated that he was basing his conclusions on his "visual observations" and "experience in life," but that there was no testing performed to identify mold in the building. *Id.* at 11.

Borough also called Kenneth DiPhillips, who was employed by Tenant and performed some maintenance work in the building after Tenant entered into the lease. N.T., 10/4/16, at 180-181. DiPhillips admitted that he had never been in the building prior the lease. *Id.* He testified that while conducting a walk-through of the property in January of 2013, he noticed that water was dripping between the glass entry and the doors to go into the

building, the carpet was wet, there were holes on the ceiling of the second floor, and there was ice and water in between the steel and the insulation. *Id.* at 182-85. He also observed that there were no gutters. *Id.* at 199. DiPhillips agreed with Tarnowski's testimony regarding the property having a negative grade, that is, the building being lower than the crown of the road. *Id.* at 182. He stated that he notified Borough Councilman Craig Reimel of his observations. *Id.* at 184.

On cross-examination, DiPhillips testified that the negative grade towards the property was open and obvious, as was the fact that there were no gutters. *Id.* at 201-02, 204-05. He also acknowledged that when he saw the ice inside the building, it was in January and it was cold enough to form ice. *Id.* at 202. DiPhillips further acknowledged that he had no training in mold remediation. *Id.* at 203. Moreover, DiPhillips testified that from the time Borough entered into the lease, only Borough had access to the property and Landlord did not interfere with Borough's possession and use of the property. *Id.* at 203-04. He also acknowledged that while he did minor repairs to property, his job was not to determine whether the HVAC system was functioning or whether there was a dehumidification system. *Id.* at 204.

Borough further called Councilman Craig Reimel. *See id.* at 250. Reimel testified that during a walk-through prior to entering into the lease, he asked, "what about the mold?" and that Landlord responded that "[t]he mold will not be an issue." *Id.* at 252. He testified that he did not ask anything else regarding mold after this brief exchange. *Id.* at 253.

Reimel further stated that he did not rely on Landlord's statement. *Id.* at 255. Reimel explained that after signing the lease, DiPhillips informed him of water dripping inside the front floor. *Id.* at 256-57. Reimel testified that he went to the building and observed the water dripping and the carpet was wet. *Id.* at 257. He further observed that there was ice behind the insulation and that he never saw or heard an HVAC, humidification, or dehumidification system. *Id.* at 260, 264. Finally, he testified that the intended purpose of the building was for a community center. *Id.* at 264.

On cross-examination, Reimel acknowledged that while he had some concerns regarding mold prior to signing the lease, the Borough never asked whether it could bring a mold inspector into the premises. *Id.* at 267. He further acknowledged that Borough did not inform Landlord when they discovered water and ice in the building. *Id.* at 268. Reimel stated that the Borough thereafter conducted three mold tests in March, July, and August of 2013 and that all of the tests revealed mold in the building. *Id.* He stated that he was "surprised to learn" that Landlord wasn't informed about the mold until the last week of August. *Id.* 270. Finally, Reimel explained that although he had concerns regarding the mold and that while he did not believe Landlord when she stated that the mold would not be an issue, he still voted to enter into the lease. *Id.* at 273-74.

During trial, Borough, who had previously indicated that Lyons would provide his expert opinion regarding the presence of mold in the building prior to the signing of the lease, proffered Lyons as an expert to testify regarding

whether the mold remediation performed by Flood Pros was successful. ***Id.*** at 163-64. Landlord, however, objected on the basis of Borough's failure to provide a copy of Lyons' expert report during discovery. ***Id.*** at 164-69. The trial court agreed and precluded Lyons from testifying. ***Id.*** at 169.

After the parties rested, they requested the opportunity to present trial briefs, which the trial court granted. On April 28, 2017, after receiving trial briefs from both parties, the trial court awarded Landlord $99,989.81. ***See*** Trial Ct. Op. & Verdict, 4/28/17. The trial court, in the opinion in support of its decision, asserted that it sustained Landlord's objections to Pierce's and Beardsley's testimony regarding the alleged presence of mold before the lease.

Both parties filed motions for post-trial relief. Landlord sought judgment *non obstante veredicto* (JNOV), or in the alternative a new trial limited to damages, and that the decision include pre-judgment interest. ***See generally*** Landlord's Mot. for Post-Trial Relief, 5/5/17 (unpaginated). Borough sought JNOV[5] due to trial court alleged errors in (1) excluding Beardsley, Pierce, and DiPhillips' testimony; (2) not granting a decision in its favor where there was impossibility or impracticability of performance; and (3) not concluding that Landlord's failure to notify Borough that the

_____

[5] Counsel for Borough requested JNOV—not a new trial—based on an alleged error in the court's evidentiary rulings. Although ordinarily this would result in waiver, we will address the issues on the merits.

remediation had been completed prevented Borough from resuming the lease. *Id.* at ¶ 1-2.

The trial court denied both motions on July 5, 2017. On August 4, 2017, Borough filed a timely appeal.[6] On August 11, 2017, Landlord filed a timely cross-appeal.[7] *See* Pa.R.A.P. 903(b) ("[I]f a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days of the date on which the first notice of appeal was served[.]"). On August 22, 2017, this Court entered an order stating that final judgment had not been entered and directing Landlord to *praecipe* the trial court's prothonotary to enter judgment, and file a certified copy of the trial court docket reflecting entry of the judgment with this Court. Order, 8/22/17. Landlord complied with this order and a final judgment was entered on August 30, 2017.

Before addressing the parties' issues on appeal, we note that the standard of review applicable to a non-jury trial is the following:

> Our appellate role in cases arising from non[-]jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of the jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue . . . concerns a question of law, our scope of review is plenary.

---

[6] Borough's appeal was docketed at 1210 MDA 2017.

[7] Landlord's cross-appeal was docketed at 1250 MDA 2017.

- 11 -

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

[Moreover, t]he trial court, as the finder of fact, is free to believe all, part or none of the evidence presented. Issues of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determination or substitute our judgment for that of the fact finder.

***Gamesa Energy USA, LLC v. Ten Penn Center Associates, L.P.***, 181 A.3d 1188, 1191-92 (Pa. Super. 2018) (internal quotation marks and citations omitted).

## I.   Borough's Appeal

Borough presents the following questions in its appeal:

1. Did the [t]rial [c]ourt improperly bar testimony of 3 of [Borough]'s fact witnesses whose testimony established the existence of mold in the subject premises during [Borough]'s occupancy of the building and prior to the lease negotiations between the parties?

2. Did the [t]rial [c]ourt err as a matter of law by failing to recognize the evidence offered by [Borough] relative to the defense of impossibility of performance of the lease due to the presence of potentially harmful mold inside the leased property, including but not limited to [Borough]'s expert witness who opined, among other things, that th[ese] premises would never be mold free as well as the fact witnesses whose testimony was stricken by the [t]rial [c]ourt?

3. Did the [t]rial [c]ourt err as a matter of law in failing to recognize that [Landlord]'s own lease required her to rectify the hazardous condition caused by the mold, and to notify [Borough] of the subsequent remediation of the premises and provide [Borough] with an opportunity to resume the lease, and does this failure in question act as a bar to [Landlord]'s recovery and require a verdict in favor of [Borough]?

Borough's Brief at 15.

### A. Fact witnesses' testimony

In its first issue, Borough argues that the trial court erred in ruling that three fact witnesses, DiPhillips, Beardsley, and Pierce, could not testify regarding the existence of mold in the building before Landlord and Borough entered into the lease agreement. *Id.* at 22. As noted above, although the court had initially denied the motion *in limine* to exclude their testimony, the court was open to revisiting the issue. Indeed, after all of the witnesses testified and the parties rested, the trial court, in its opinion in support of its decision granted the motion *in limine* and excluded "any evidence relating to the presence of mold in the building prior to the parties entering into the lease." Trial Ct. Op. & Vedict at 3. The court stated that "there [wa]s no evidence that any discussions about mold occurred prior to the signing of the lease and no evidence by [Borough] that it relied on assurances from [Landlord] about this issue." *Id.* It explained that the only testimony regarding this issue was from Borough Council member, Reimel, who asked Landlord about mold in the building during a walk through, to which Landlord responded that it was not an issue. *Id.* Reimel testified, however, that he did not rely on Landlord's statement. *Id.*

Landlord counters that the witnesses excluded by the trial court were not identified until eight days before trial "despite the fact that [Landlord] had served discovery requests seeking identification of witnesses more than two years [earlier]." Landlord's Reply Brief at 23. Moreover, Landlord continues,

Borough does not justify why it failed to identify the witnesses in a timely manner. *Id.* Landlord further asserts that Borough not only provided no legal authority as to how the trial court erred, but also did not articulate how it was harmed by the trial court's alleged error. *Id.*

When reviewing a trial court's determination on motions *in limine*, we apply an abuse of discretion standard. *See Turner v. Valley Housing Development Corp.*, 972 A.2d 531, 535 (Pa. Super. 2009) (citation omitted). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous." *Crespo v. Hughes*, 167 A.3d 168, 177 (Pa. Super. 2017) (citation omitted).

> The purpose of the discovery rules is to prevent surprise and unfairness and to allow a fair trial on the merits. Analogous case law on this subject is found in those decisions that discuss whether to allow the testimony of a witness who has not been included in a pre-trial memorandum. Such cases focus on the factors a court must consider in determining whether or not a witness should be precluded for failure to comply with discovery rules. These factors are: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of cases in the court, (4) bad faith of [sic] willfulness in failing to comply with the court's order. In the absence of bad faith or willful disobedience of the rules, the most significant considerations are the importance of the witness' testimony and the prejudice, if any, to the party against whom the witness will testify.

*Smith v. Grab*, 705 A.2d 894, 902 (Pa. Super. 1997) (internal quotation marks, citations, and alterations omitted). We agree with the above rationale and discern no abuse of discretion by the trial court in granting the motion *in limine*. *See id.*

### B. Defense of impossibility of performance

Initially, Borough argues that the purpose of the lease was to "establish[] either a community center, business incubator, or a combination of the two." Borough's Brief at 23. Borough argues that the parties discussed this purpose and that it would require the involvement and participation of the general public. *Id.* Landlord claims that the "existence of high levels of potentially harmful mold on the leased premises effectively prevented the [Borough] from using the property for its intended (and negotiated for) use, and indeed, any use that could include or involve the general public." *Id.* at 24. This, Borough analogizes, is the functional equivalent of a fire leveling the building. *Id.* Borough relies on *Greenfield & Co. v. Kolea*, 380 A.2d 758 (Pa. 1977), in support of its position. *Id.* at 24-25.

In support, Borough contends that the testimony of its expert, Tarnowski, regarding "the strong likelihood that the leased building's construction assured that the mold therein would be difficult, if not impossible, to eradicate," fully supports Borough's defense of impossibility. *Id.* at 24-25. Borough claims this testimony proves that the building could not be used for public purposes. *Id.* at 25.

Finally, Borough points to paragraph 23 of the lease,[8] which addresses the occurrence of "damages to premises." *Id.* Borough argues that the paragraph "clearly states that upon notice to the Landlord of a dangerous or defective condition, the Borough shall not be required to pay rent for the premises that are unusable," and "that the condition causing the inability to use the premises []shall be repaired by the Landlord as speedily as reasonably possible." *Id.* Borough claims it attempted to communicate with Landlord twice regarding the situation but that Landlord stated that Borough "caused the mold and [Borough] was responsible for its clean up." *Id.* at 26.

_____

[8] Specifically, paragraph 23 of the lease provides:

> 23. <u>DAMAGE TO PREMISES</u>:
>
> A. [Borough] must give Landlord prompt notice of fire, accident, damage or dangerous or defective condition. If the Premises cannot be used because of fire or other casualty, [Borough] is not required to pay rent for the time the Premises are unusable. If part of the Premises cannot be used, [Borough] must pay rent for the usable part.
>
> B. In case the Premises shall be damaged by fire or other casualty, the same shall be repaired by Landlord as speedily as reasonably possible. In case the Premises shall be totally destroyed or so damaged by fire or other casualty, the same incapable of repair and restoration within six (6) months, then either party, by notice given to the other within thirty (30) days after such destruction or damage, may elect to cancel and terminate this Lease. If in such case neither party elects to terminate this Lease, Landlord shall proceed to rebuild or restore the Premises as promptly as possible. If this Lease is canceled under this paragraph, Landlord shall not be required to repair or rebuild this building.

*See* Lease, 12/21/12, at ¶ 23.

It is well-established that contract law governs lease agreements.

***Gamesa***, 181 A.3d at 1192. We have explained that:

> [t]he interpretation of any contract is a question of law and this Court's scope of review is plenary. Moreover, we need not defer to the conclusions of the trial court and are free to draw our own inferences. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

***Id.*** (citing ***Loughman v. Equitable Gas Co., LLC***, 134 A.3d 470, 474 (Pa. Super. 2016)).

This Court has explained the doctrine of impossibility of performance as follows:

> Pennsylvania law recognizes the doctrine of frustration of contractual purpose or "impracticability of performance" as a valid defense to performance under a contract.
>
> The Restatement (Second) of Contracts § 261 provides:
>
> § 261. Discharge By Supervening Impracticability
>
> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.
>
> Restatement (Second) of Contracts § 261 (1981).
>
> ***
>
> Once impracticability of performance or frustration of purpose occurs, "it is up to the parties to waive the difficulties or seek to

- 17 -

terminate the agreement." [***Ellwood City Forge Corp. v. Fort Worth Heat Treating Co., Inc.***, 636 A.2d 219,] 223 (Pa. Super. 1994). If a party proceeds under the original contract, despite the impracticability that would otherwise justify his non-performance, and is then unable to perform as previously agreed, he can be liable for damages. Restatement (Second) of Contracts § 261 (1981). On the other hand, a party who has already performed under a contract, which is dissolved on the ground of supervening impracticability, is generally allowed a claim for restitution to the extent his performance has benefited the other party. Restatement (Second) of Contracts § 272 Comment: b. Relief including restitution. In a proper case recovery may go beyond mere restitution and include elements of reliance by the claimant, even though they have not benefited the other party.

***Hart v. Arnold***, 884 A.2d 316, 335 (Pa. Super 2005) (some internal quotation marks and citations omitted).

In ***Greenfield***, the case relied upon by Borough, an accidental fire destroyed one of the buildings leased by the tenant. ***Greenfield***, 380 A.2d at 758. The lease agreement did not contain a provision with respect to the tenant's obligations in the event of destruction due to a fire. ***Id.*** The Pennsylvania Supreme Court held that "the accidental destruction of the building by fire excused the parties from further performance of their obligations under the lease." ***Id.*** at 760. In so holding, the Court replaced an "outdated common law presumption [that] the land [i]s always more valuable than the buildings erected on it." ***Id.*** at 760. The Court explained that buildings are critical to the functioning of modern society and that when parties bargain for the use of a building, "the soil beneath is generally of little consequence." ***Id.***

In *Hirsch v. Carbon Lehigh Intermediate Unit # 21*, 65 Pa. D. & C.4th 390 (C.C.P. Carbon Cty. 2003),[9] the case relied upon by Landlord, the tenant discovered mold in a building it had leased for purposes of a Learning Adjustment School. *Hirsch*, 65 Pa. D. & C.4th at 392. The first time the tenant discovered mold, it informed the landlord who remediated the problem, and tenant moved back in. *Id.* Approximately a year later, tenant again discovered mold. *Id.* at 395-97. The tenant had some environmental studies performed on the building to determine the occurrence of mold. *Id.* Then, with no advance notice, the tenant mailed a letter to landlord advising landlord that the Board had voted to terminate the lease effective as of the end of the month. *Id.* at 397.

The trial court, in *Hirsch*, found that tenant had no valid reason for terminating the lease. *Id.* at 401. The court reasoned that "[t]he occurrence of mold, though an uninsured condition, did not entitle tenant to terminate the lease under paragraph 19, which pertains to damage by fire or other casualty. The occurrence of mold in this case did not cause the leased premises to be totally or partially destroyed." *Id.* at 401. Further, "landlord was never notified and given a reasonable opportunity to correct the condition." *Id.*

---

[9] We note that except for when the law-of-the-case doctrine applies, generally, "trial court decisions are not binding upon the Superior Court." *Echeverria v. Holley*, 142 A.3d 29, 36 n.2 (Pa. Super. 2016).

Here, the trial court found that **_Greenfield_** was wholly inapplicable. **_See_** Trial Ct. Op. & Verdict at 4. The trial court explained that the facts in **_Greenfield_** significantly differ from the present facts. **_Id._** The court further found **_Hirsch_**, the case relied upon by Landlord in its trial brief, to be more akin to the present facts. **_Id._**

Initially, Borough's contention that Tarnowski's testimony proves that the building could not be used for public purposes is not supported by the record. Tarnowski testified that "the building condition certainly could lead to continued mold problems **if they weren't remediated**." N.T., 10/4/16, at 130 (emphasis added).[10] Thus, the premise for the Borough's position that it was justified in invoking the impossibility of performance doctrine lacks record support.[11]

Even if impracticability of performance had occurred, Borough "waived the difficulty" by continuing with the lease. **_See Hart_**, 884 A.2d at 335.

_____

[10] Borough claims that Tarnowski testified that there was a strong likelihood that due to the leased building's construction, the mold therein would be difficult, if not impossible, to eradicate. **_See_** Borough's Brief at 24-25. We have thoroughly reviewed Tarnowski's testimony and we cannot find this contention in the record. **_See generally_** N.T., 10/4/16, at 117-158 (Testimony of Tarnowski). Further, Borough has failed to cite to the relevant pages in the record where this testimony can be found.

[11] We observe that Borough's proposition that presence of mold in the building is equal to a fire destroying the building is unconvincing. Unlike a fire that destroys a building and renders it completely unusable, mold can be remediated. **_See generally_** Dep. of Kevin Telfer (discussing mold remediation); N.T., 10/4/16, at 117-158 (Testimony of Tarnowski) (same). Thus, it follows that because mold did not render the building destroyed or beyond repair and restoration, paragraph 23 of the lease is inapplicable.

Borough first tested the building for mold on March 13, 2013, approximately three months after the signing of the lease, and the building tested positive for mold. *See id.* at 98. Borough did not notify Landlord of the results. *Id.* at 99. Borough conducted a second testing for mold in July of 2013, which again tested positive for mold. *Id.* Borough conducted a third testing for mold in August of 2013, which also revealed mold. *Id.* Borough did not terminate the lease after receiving the results of any of the three tests. Moreover, Borough did not notify Landlord of the results of these tests. It was not until the end of August of 2013 that Borough contacted Landlord regarding the mold issue, and not until December 31, 2013 that it terminated the lease agreement. *See id.* at 107; Ltr. Terminating Lease, 11/6/13. For all of the foregoing reasons, we conclude the trial court did not abuse its discretion in finding that the presence of mold did not entitle Borough to terminate the lease. *See Hart*, 884 A.2d at 335 (citing Restatement (Second) of Contracts § 261).

### C. Notice of remediation

In its last issue, Borough argues that under the lease agreement that Landlord drafted,[12] Landlord was obligated to remediate the situation and notify Borough. Borough's Brief at 27. Borough argues that while Landlord

---

[12] In her reply brief, Landlord argues that this contention was never raised or established at trial. Landlord's Reply Brief at 11. Further, Landlord argues that the statement is "factually inaccurate in that both parties were represented by counsel at the time the lease was negotiated between the parties." *Id.*

- 21 -

fulfilled her obligation to remediate, she failed to notify Borough. *Id.* Moreover, Borough contends that because it had given notice to Landlord of its intent to terminate the lease effective December 31, 2013, Landlord should have notified Borough of the remediation "given the fact that [the] lease term was still in place." *Id.* Finally, Borough claims that Landlord, "despite knowing the intended use of the building and that she was responsible for all casualties occurring within it[,] refused and failed to meet her duty under this contract to provide [Borough] with . . . premises that would be environmentally suitable for use as a public facility." *Id.* at 28. Therefore, Borough continues, "[h]er failure to do so effectively nullified the lease with [Borough]." *Id.*

Pennsylvania Rule of Appellate Procedure 2119(a) provides that "[t]he argument shall [have] such discussion **and citation of authorities** as are deemed pertinent." Pa.R.A.P. 2119(a) (emphasis added). Failure to include citations to relevant authority constitutes waiver of this issue on appeal. ***Giant Food Stores, LLC v. THF Silver Spring Development, L.P.***, 959 A.2d 438, 444 (Pa. Super. 2008) (citation omitted).

Borough's argument on this issue consists of two lengthy paragraphs. Borough, however, includes absolutely no citation to relevant case law or rules in support of its position that Landlord was under a duty to notify Borough that the remediation had been successfully completed. In fact, Borough has included one citation to paragraph 23 of the lease, which does not discuss notice after mold remediation. Accordingly, we find this issue waived.

- 22 -

In any event, as we discussed above, paragraph 23 of the lease is inapplicable to the situation where the building requires mold remediation. Moreover, paragraph 23 of the lease makes no mention of a requirement that Landlord give notice to Borough after mold remediation has been performed. *See* Lease, 12/21/12, at ¶ 23.

## II.  Landlord's Appeal

Landlord raises the following questions on appeal:

1. Did the trial court err when it failed to grant [Landlord]'s motion for JNOV or in the alternative a new trial limited to damages only when the trial court inappropriately calculated the damages due [Landlord] by failing to place her in as good a position as she would have been but for the breach of contract by the [Borough]?

2. Did the trial court err as a matter of law in failing to grant prejudgment interest to [Landlord]?

Landlord's Brief at 6 (full capitalization omitted).

### A. Calculation of damages

In support of Landlord's first issue, she argues that the lease was for a duration of five years and that Borough failed to make any payments after the first year. *Id.* at 20.  Landlord claims that she is entitled to the full amount of rent owed under the lease because that would put her in the same position as she would have been but for the breach of contract. *Id.*  She claims the trial court erred because it "deviated from existing law and utilized [Landlord]'s testimony regarding her attempts to mitigate her damages to engage in a *quantum meruit* analysis of the fair rental value for the property."

*Id*. at 20-21. Landlord further claims that "[w]hen the parties explicitly agree and contract for a monthly rental it is beyond the province of the trial court to set aside such an agreement and engage in a *quantum meruit* analysis for fair rental." *Id.* at 22. Landlord contends that the proper award or damages would be $239,760, which represents forty-eight months at $4,995 per month. *Id.* at 23. Finally, Landlord argues that the trial court erred in depriving her of rent during the time she was remediating and repairing the property because Borough had already engaged in conduct constituting anticipatory breach. *Id.* at 24.

The Pennsylvania Supreme Court has discussed the damages prong of the breach of contract analysis as follows:

> Where one party to a contract, without any legal justification, breaches the contract, the other party is entitled to recover, unless the contract provided otherwise, whatever damages he [or she] suffered, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty.

*Ferrer v. Trustees of the Univ. of Pennsylvania*, 825 A.2d 591, 610 (Pa. 2002) (internal quotation marks and citation omitted). "A damage award should place the non-breaching party as nearly as possible in the same position [it] would have occupied had there been no breach." *Gamesa*, 181 A.3d at 1194 (internal quotation marks and citation omitted).

Here, the lease agreement provides as follows:

27. MITIGATION

- 24 -

> Not[]withstanding any term previously set forth herein, the parties agree that in the event Tenant's reasonably accepted use(s) for the premises do not meet with meaningful success as reasonably determined by Tenant, Tenant shall not be excused from performance under the lease.
>
> Provided, however, that should Tenant vacate the premises after at least thirty (30) days written notice to Landlord, Landlord agrees to exercise reasonable commercial efforts to relet or and/or sell the premises. If Landlord is able to relet the premises, Tenant shall be entitled to a credit for rent received from Landlord's new tenant less any costs actually incurred by Landlord in achieving the reletting of the premises.

R.R. at 23a.

While Landlord attempted to find other lessees, her attempts were unsuccessful and she did not receive any amount in mitigation of damages. No party has challenged the sufficiency of Landlord's attempts to mitigate. Therefore, the trial court erred as a matter of law when, in its calculation of damages, it presumptively decreased the amount of damages Landlord was entitled to by applying the amount she could have made had she, in fact, actually relet the premises. Indeed, the trial court cited no legal authority for doing so. **See** Trial Ct. Op. & Verdict at 5-6. We therefore remand for the trial court to conduct a hearing limited to recalculation of damages based on the existing record.

### B. Prejudgment interest

In her second issue, Landlord argues that the trial court erred in not granting her pre-judgment interest. Landlord's Brief at 24-25. She relies on **TruServ v. Morgan Tool & Supply Co.**, 39 A.3d 253 (Pa. 2012), in support of her argument that "when a party's right to the payment of interest is not

specifically addressed by the terms of the contract, the non[-]breaching party to a contract may recover, **as damages**, interest on the amount due under the contract." Landlord's Brief at 25 (citing *TruServ*, 39 A.3d at 263). Landlord argues that Pennsylvania, through *TruServ*, adopted Section 354 of the Restatement (Second) of Contracts, which states that "an award of prejudgment interest under Section 354 is not subject to a court's discretion." *Id.* (citing *TruServ*, 39 A.3d at 263-64). Landlord claims that "[t]he statutory rate of interest in Pennsylvania is six percent (6%) per anuum. *Id.* (citing 41 P.S. § 202). Thus, Landlord claims, because Borough "repudiated the lease contract at the conclusion of 2013, [Landlord] is entitled to prejudgment interest on all sums due her from the outset of 2014 through the date of verdict." *Id.*

We review a denial for pre-judgment interest for an abuse of discretion. *See Cresci Const. Servs., Inc. v. Martin*, 64 A.3d 254, 258 (Pa. Super. 2013) (citation omitted).

We have explained that "[a] court has discretion to award or not award prejudgment interest on some claims, but must or must not award prejudgment interest on others." *Id.* (citing *Fidelity Bank v. Com. Marine and Gen. Assurance Co.*, 592 F. Supp. 513, 522 (E.D. Pa. 1984)). Section 354 of the Restatement (Second) of Contracts provides:

> (1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for

performance on the amount due less all deductions to which the party in breach is entitled.

(2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

*Cresci*, 64 A.3d at 259 (citing Restatement (Second) of Contracts § 354(1)-(2) (1981)). Thus, "before awarding prejudgment interest, the court must identify the nature of the breach." *Id.*

We further explained that:

Section 337(a) of the Restatement (First) of Contracts provides:

If the parties have not by contract determined otherwise, simple interest at the statutory legal rate is recoverable as damages for breach of contract as follows:

(a) Where the defendant commits a breach of a contract to pay a definite sum of money, or to render a performance the value of which in money is stated in the contract or is ascertainable by mathematical calculation from a standard fixed in the contract or from established market prices of the subject matter, interest is allowed on the amount of the debt or money value from the time performance was due, after making all the deductions to which the defendant may be entitled.

*Id.* at 258 (citing Restatement (First) of Contracts § 337(a)).[13]

Under this standard, recovery of pre-judgment interest is a matter of law, not of discretion. *Id.* Therefore, in Pennsylvania, pre-judgment interest

---

[13] "Restatement [(First)] of Contracts § 337(a) (1932) is currently found at Restatement (Second) of Contracts § 354(1) (1981)." *Cresci*, 64 A.3d at 260 (alteration in original omitted).

may be recovered only if:

> (1) a defendant commits a breach of a contract to pay a definite sum of money; or
>
> (2) a defendant commits a breach of contract to render a performance the value of which in money is stated in the contract; or
>
> (3) a defendant commits a breach of contract to render a performance the value of which is ascertainable by mathematical calculation from a standard fixed in the contract; or
>
> (4) a defendant commits a breach of a contract to render a performance the value of which in money is ascertainable from established market prices of the subject matter[.]

*Id.* (emphasis omitted).

> Otherwise, pre-judgment interest is awarded at the court's discretion:
>
> *d. Discretionary in other cases.* Damages for breach of contract include not only the value of the promised performance but also compensation for consequential loss. The amount to be awarded for such loss is often very difficult to estimate in advance of trial and cannot be determined by the party in breach with sufficient certainty to enable him to make a proper tender. In such cases, the award of interest is left to judicial discretion, under the rule stated in Subsection (2), in the light of all the circumstances, including any deficiencies in the performance of the injured party and any unreasonableness in the demands made by him.

Restatement (Second) of Contracts § 354 cmt. d.

Here, the contract provided for a specified amount – $59,940 annual rent, payable in monthly installments of $4,995, plus all real estate taxes, insurance, utilities, and any and all maintenance, upkeep, and repairs. *See* Trial Ct. Op. & Verdict at 1. Because Borough breached the lease agreement to pay a definite sum of money, Landlord was entitled to pre-judgment interest as a matter of law. *See Cresci*, 64 A.3d at 258; Restatement (Second) of

- 28 -

Contracts § 337(a). Therefore, we conclude that the trial court erred in not awarding Landlord pre-judgment interest.

Accordingly, we remand with instructions to conduct a hearing limited to recalculation of damages based on the existing record and to award pre-judgment interest. Based on this record, no new trial on damages is required.

Judgment is vacated. Order denying Landlord's post-trial motion is affirmed in part and reversed in part. Order denying Borough's post-trial motion is affirmed. Remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/13/18