J-A04026-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| PCA EMSTAR HOLDINGS, L.P. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PHILADELPHIA POST-ACUTE | : | |
| PARTNERS A/K/A GOOD SHEPHERD | : | |
| PENN PARTNERS, RHA | : | No. 1128 EDA 2023 |
| PENNSYLVANIA NURSING HOMES, | : | |
| INC. A/K/A PROSPECT PARK HEALTH | : | |
| AND REHAB., HARLEE MANOR, INC. | : | |
| A/K/A HARLEE MANOR NURSING | : | |
| AND REHAB CENTER, 2509 SOUTH | : | |
| FOURTH OPERATING, LLC A/K/A ST. | : | |
| MONICA CENTER FOR REHAB AND | : | |
| HEALTHCARE, IVY HILL, SNF, LLC | : | |
| A/K/A IVY HILL REHAB AND | : | |
| NURSING CENTER,  MERCY HEALTH | : | |
| SYSTEM OF S.E. PENNSYLVANIA | : | |
| A/K/A MERCY HEALTH SYSTEM, | : | |
| PENNSYLVANIA HOSPITAL OF THE | : | |
| UNIVERSITY OF PA HEALTH SYSTEM | : | |
| A/K/A HALL-MERCER COMMUNITY | : | |
| BEHAVIOR HEALT CENTER, | : | |
| CONTRIBUTORS TO PENNSYLVANIA | : | |
| HOSPITAL A/K/A PENNSYLVANIA | : | |
| HOSPITAL, TRUSTEES OF THE | : | |
| UNIVERSITY OF PENNSYLVANIA | : | |
| A/K/A UNIVERSITY OF PA MEDICAL | : | |
| CENTER HOSPITAL OF THE | : | |
| UNIVERSITY OF PENNSYLVANIA, | : | |
| PRESBYTERIAN MEDICAL CENTER OF | : | |
| UNIVERSITY OF PA HEALTH SYSTEM, | : | |
| KEYSTONE QUALITY TRANSPORT | : | |
| COMPANY,  TODD M. STRINE, | : | |
| STEPHEN BARR, ST. AGNES | : | |
| CONTINUING CARE CENTER A/K/A | : | |
| MERCY LIFE, TENET HEALTH SYSTEM | : | |
| ST. CHRISTOPHER'S HOSPITAL FOR | : | |
| CHILDREN, LLC, A/K/A ST. | : | |
| CHRISTOPHER'S HOSPITAL FOR | : | |

J-A04026-24

CHILDREN, ALBERT EINSTEIN          :
HEALTH CARE NETWORK, MAGEE         :
MEMORIAL HOSPITAL FOR              :
CONVALESCENTS A/K/A MAGEE          :
REHABILITATION HOSPITAL            :
                                   :
                                   :
                                   :
APPEAL OF: KEYSTONE QUALITY        :
TRANSPORT

Appeal from the Judgment Entered April 21, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 151002762

PCA EMSTAR HOLDINGS, L.P.          :    IN THE SUPERIOR COURT OF
                                   :          PENNSYLVANIA
                   Appellant       :
                                   :
                                   :
                                   :
            v.                     :
                                   :
                                   :
                                   :
PHILADELPHIA POST-ACUTE            :    No. 1279 EDA 2023
PARTNERS A/K/A GOOD SHEPHERD       :
PENN PARTNERS, RHA                 :
PENNSYLVANIA NURSING HOMES,        :
INC. A/K/A PROSPECT PARK HEALTH    :
AND REHAB., HARLEE MANOR, INC.     :
A/K/A HARLEE MANOR NURSING         :
AND REHAB CENTER, 2509 SOUTH       :
FOURTH OPERATING, LLC A/K/A ST.    :
MONICA CENTER FOR REHAB AND        :
HEALTHCARE, IVY HILL, SNF, LLC     :
A/K/A IVY HILL REHAB AND           :
NURSING CENTER,  MERCY HEALTH      :
SYSTEM OF S.E. PENNSYLVANIA        :
A/K/A MERCY HEALTH SYSTEM,         :
PENNSYLVANIA HOSPITAL OF THE       :
UNIVERSITY OF PA HEALTH SYSTEM     :
A/K/A HALL-MERCER COMMUNITY        :
BEHAVIOR HEALT CENTER,             :
CONTRIBUTORS TO PENNSYLVANIA       :
HOSPITAL A/K/A PENNSYLVANIA        :
HOSPITAL, TRUSTEES OF THE          :
UNIVERSITY OF PENNSYLVANIA         :

- 2 -

A/K/A UNIVERSITY OF PA MEDICAL : 
CENTER HOSPITAL OF THE : 
UNIVERSITY OF PENNSYLVANIA, : 
PRESBYTERIAN MEDICAL CENTER OF : 
UNIVERSITY OF PA HEALTH SYSTEM, : 
KEYSTONE QUALITY TRANSPORT : 
COMPANY,  TODD M. STRINE, : 
STEPHEN BARR, ST. AGNES : 
CONTINUING CARE CENTER A/K/A : 
MERCY LIFE, TENET HEALTH SYSTEM : 
ST. CHRISTOPHER'S HOSPITAL FOR : 
CHILDREN, LLC, A/K/A ST. : 
CHRISTOPHER'S HOSPITAL FOR : 
CHILDREN, ALBERT EINSTEIN : 
HEALTH CARE NETWORK, MAGEE : 
MEMORIAL HOSPITAL FOR : 
CONVALESCENTS A/K/A MAGEE : 
REHABILITATION HOSPITAL

Appeal from the Judgment Entered April 21, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  151002762

BEFORE:   STABILE, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED MAY 31, 2024**

PCA EMStar Holdings, L.P. ("EMStar") and Keystone Quality Transport Company ("Keystone") cross-appeal from the judgment entered in favor of EMStar in EMStar's breach of contract action. We vacate the judgment and remand for the inclusion of prejudgment interest.

Both parties owned and operated paramedic ambulance and health-related transportation businesses when they entered a Management Agreement ("the Agreement") with an effective date of February 9, 2014. Under the Agreement, EMStar was to move its business and assets into

---

[*] Retired Senior Judge assigned to the Superior Court.

Keystone's infrastructure, and Keystone was to assume management of EMStar's daily operations. In exchange, Keystone was to pay EMStar 1% of the gross monthly revenue arising from the operation of the two businesses (the "monthly gross revenue payment"). *See* Article 3.1.

The Agreement provided that EMStar was to transfer title to its vehicles to Keystone prior to the effective date. *See* Article 6.1(j). EMStar was also to assign any vehicle leases or loans to Keystone on or before the effective date and deliver the assignments to Keystone. *Id.* In return, Keystone was to assume the financial obligations under the vehicle leases and loans:

> On or before the Effective Date, or as soon as practicable thereafter, [EMStar] shall deliver to [Keystone] valid assignments of Vehicle Leases and thereafter, [Keystone] shall assume such obligations under the Vehicle Leases and [Keystone] shall take title to the Leased Vehicles and the Loaned Vehicles, as the case may be, subject to the Vehicle Leases and the Vehicle Loans, as the case may be.

*Id.*[1]

Both parties "agree[d] to use reasonable efforts to support the seamless transition of day-to-day operations of [EMStar] from [EMStar] to [Keystone], including, but not limited to, assisting [Keystone] with the transfer to [Keystone] of the licenses, titles and registration with respect to the Vehicles." Article 2.1(a).

---

[1] *See also* Article 9.1(c) (stating Keystone agreed to indemnify EMStar for any obligations relating to the leased vehicles on or after the effective date); Article 2.4 ("Notwithstanding anything in this Agreement to the contrary, all lease payments for the Leased Vehicles pursuant to the Vehicle Leases, and all loan payments for the Loaned Vehicles pursuant to the Vehicle Loans, shall be paid by [Keystone]").

Next, the Agreement required EMStar, within 60 days, to extend a $1 million line of credit to Keystone. *See* Article 5.1. Interest would accrue at 8%. *See id.* Keystone was to pay the balance of the loan by the earlier of (1) the date of Keystone's termination of the Agreement or (2) May 1, 2015. *See id.*

Both businesses were to collect revenue and undergo a monthly reconciliation process. Keystone would invoice certain customers (the "facilities accounts receivable") and those customers would pay into a lockbox controlled by EMStar. *See* Articles 2.2, 2.3. Other receivables billed to Medicare, Medicaid, third-party insurers, or private individuals, were to be paid directly to Keystone. *See* Article 2.3.

On the first day of each month, EMStar was to withdraw $25,000 from the lockbox as an "advance revenue payment." *See* Article 3.2. EMStar was also to withdraw the amount it needed for any vehicle loan and lease payments and interest that had accrued on its loan to Keystone. *See* Articles 3.2, 5.1. EMStar was to continually submit any surplus in the lockbox, aside from a buffer amount, to Keystone. *See* Article. 3.2.

Next, on the 10th of the month, Keystone was to provide EMStar with a statement reporting its gross revenue for the preceding month. *See id.* By the 15th of the month, EMStar was to calculate the difference between the advance revenue payment it had already withdrawn and the total monthly gross revenue payment Keystone owed. *See* Articles 3.2, 3.1. EMStar was then to withdraw the difference (if any) from the lockbox. *See* Article 3.2. If

the funds in the lockbox were insufficient to make up the difference, Keystone had to pay the remainder to EMStar within three business days. *Id.*

The Agreement also gave EMStar the right to inspect and audit at any time Keystone's accounting records. *See* Article 3.3. Keystone was to reimburse EMStar for any underpayment, plus 8% interest. *See id.*

Articles 4.1 and 4.2 addressed termination of the Agreement. Keystone could terminate at any time upon 30 days' notice "and only upon the payment by [Keystone] to [EMStar] of the Termination Payment." Article 4.1, 4.2. The "Termination Payment" was defined as $2 million or the product of a formula: 24 times the sum of the highest consecutive three monthly gross revenue payments of the preceding 12 months.[2] *See* Article 4.2. Keystone also had to repay EMStar the outstanding balance of any loan plus interest. *See id.* EMStar was then to transfer all remaining assets to Keystone in exchange for $1. *See id.*

Articles 10.1 and 10.2 addressed default. Keystone would be in default if it failed to pay EMStar any money due under the Agreement. *See* Article 10.2. In addition, either party would be in default if it failed to comply with any condition or provision in the Agreement for more than 10 days after the other party provided it with written notice "specifying the nature of [its] failure." Articles 10.1, 10.2. However, a party would not be in default "if the said failure shall be of a nature that the same cannot be completely cured or

_____

[2] The formula was subject to a proviso not applicable here. *See* Article 4.2.

remedied within said ten (10) day period" and the party "diligently commenced to remedy or cure such failure." Articles 10.1, 10.2. If either party was in default, the other could terminate the Agreement through written notice and exercise "any and all rights and remedies available at law, in equity, or otherwise." *Id.*

The Agreement had a severability provision and an integration clause. *See* Articles 11.10, 11.3. It further stated that it could be modified only by a writing signed by both parties. *See* Article 11.6.

In June 2016, Keystone sent a letter to EMStar stating it was terminating the Agreement due to alleged defaults by EMStar. The letter stated the Agreement was retroactively terminated as of February 10, 2015.

EMStar initiated this suit and in a second amended complaint,[3] it asserted four counts against Keystone. Count I requested a declaratory judgment that Keystone's attempt to terminate the Agreement was invalid and the Agreement remained in effect. EMStar alleged that the termination letter was not valid because it backdated the termination, it failed to specify the nature of EMStar's alleged defaults or provide it a 10-day "cure" period, and Keystone had "continued to operate EMStar's business without paying the requisite $2 million Termination Payment or returning any of EMStar's assets or customer contracts[.]" Second Am. Comp., 7/3/18, at ¶ 47.

_____

[3] Prior complaints listed other defendants in addition to Keystone that are reflected in the caption but are not parties to this appeal.

- 7 -

Count II was for breach of contract. It alleged that Keystone had breached Article 2.3 by diverting some of the facilities accounts receivable from being sent to the lockbox and had breached Articles 3.1 and 3.2 by failing to make the monthly gross revenue payments, vehicle lease payments, and vehicle loan payments. EMStar alleged damages "through the present date." *See id.* at ¶¶ 53, 54.

Count III was also for breach of contract, brought in the alternative to Counts I and II. EMStar claimed that Keystone had breached Article 4.1 by failing to pay it $2 million when it terminated the Agreement without cause. It also alleged Keystone had breached the Agreement by failing to pay EMStar the monthly gross revenue payments, vehicle lease payments, and vehicle loan payments through the date of the termination. *See id.* at ¶¶ 59-60.

Count IV was for unjust enrichment. This claim alleged that Keystone had acquired EMStar's assets and customer contacts without due compensation.

The court held a five-day bench trial during which it heard the testimony of Keystone's executive director, Todd Strine; EMStar's CEO, Joseph Zupnik; EMStar's executive director, Daniel Herman; and a forensic accountant, Edward Waddington.

Following trial, the court made findings of fact and conclusions of law. It denied relief on Count I, granted relief on Count III, and dismissed Counts II and IV as moot. The court found that while the Agreement was in effect, disputes had arisen between the parties in five main areas: (1) the transfer of

vehicle titles, (2) EMStar's payments to Keystone; (3) the line of credit, (4) the diversion of facilities accounts receivable from the lockbox, and (5) the gross monthly revenue payments to EMStar.

First, regarding the vehicle transfers, the court found that the record was "unclear" as to whether title to all the vehicles identified in the Agreement had been transferred. Trial Court Opinion, filed 12/2/22, at 6. The court noted that Keystone had sent an e-mail to EMStar in March 2014 stating it still needed help with registering approximately half of the scheduled vehicles. *Id.* EMStar had thereafter provided signed affidavits of title and powers of attorney to facilitate the transfer of the vehicle titles. *Id.* Although EMStar offered testimony that title to those vehicles had transferred, Keystone countered with testimony that the titles had never transferred. *Id.* at 6, 18.

However, EMStar conceded that title to two new pediatric ambulances (the "St. Christopher's vehicles") had never been transferred to Keystone. *Id.* at 5-9, 18. The court found Keystone had advised EMStar in writing in November 2014 that it considered this to be a "material breach." *Id.* at 8. EMStar responded that to transfer the titles to those vehicles, for which there were outstanding loans, the lender – First Commerce Bank – required either EMStar to pay down the loan or Keystone to refinance the vehicles. *Id.* at 7-8. Keystone maintained the Agreement required EMStar to transfer title without any additional actions or payments by Keystone. *Id.* at 19, 20. Keystone ultimately returned the vehicles to the dealer. *Id.* at 8 (citing N.T., 12/7/21, at 142).

Regarding payments from EMStar to Keystone, the court found that Keystone alerted EMStar in October 2014, in writing, that it had failed to transfer certain receipts from the facility billings. *Id.* at 9. Although EMStar's position was that those funds were not to be transferred to Keystone until the following month, after reconciling the previous month, EMStar transferred additional money to satisfy Keystone. *Id.* at 9, 21-22.

Next, the court found that EMStar alleged that Keystone had directed some customers to remit payment directly to Keystone, rather than to the lockbox. Keystone had alleged that because EMStar had never provided the line of credit the Agreement required, in December 2014, the parties "negotiated that the facility accounts receivable would go directly to Keystone as opposed to EMStar's lockbox." *Id.* at 10-11. EMStar countered that Keystone had never requested EMStar provide a line of credit in writing and disputed that it had ever agreed to modify the Agreement to allow facilities accounts receivable to be diverted from the lockbox. *Id.*

Finally, regarding the gross monthly revenue payments, the court found that EMStar notified Keystone in July 2015 that its gross monthly revenue payment to EMStar had been insufficient and requested an accounting. *Id.* at 10. Keystone thereafter stopped providing EMStar with its monthly accounting records and stopped making the gross monthly revenue payments to EMStar. *Id.* at 11.

The court also recounted that EMStar had offered two calculations of damages. The first was Zupnik's estimation of the gross monthly revenue

payments for eight years ($2.4 million) and 8% interest on that amount, plus $655,699 in outstanding vehicle lease obligations. *Id.* at 12-13. The second was the forensic accountant's estimation of the gross monthly revenue payment up to September 2021 (approximately $1.2 million). *Id.* at 13-14.

The court denied relief on Count I, in which EMStar had requested a declaration that Keystone's termination of the Agreement invalid and the Agreement was in force. The court found that while Keystone had notified EMStar in writing in 2014 that it was in default because it had withheld funds, Keystone failed to prove that EMStar had withheld more money than it was entitled to. The court also concluded that Keystone's demand that EMStar submit its receipts a month in advance was contrary to the terms of the Agreement. *Id.* at 21-22.

The court next found that although Keystone had notified EMStar in writing around the time the Agreement took effect that it had not received title to some vehicles, the court credited Zupnik's testimony that EMStar had provided Keystone with the necessary powers of attorney to allow it to complete the transfers. The court also found that, because the record showed ongoing negotiations regarding only the St. Christopher's vehicles, the parties had resolved the issues with other vehicles. *Id.* at 18-19.

The court further found that while Keystone had notified EMStar that it considered EMStar's failure to transfer the title to the St. Christopher's vehicles to be a material breach, EMStar had made sufficient attempts to transfer title for those vehicles. The court observed that Article 2.1 of the

Agreement required the parties to use "reasonable efforts" to support the transfer of the vehicle titles and that Keystone was responsible for assuming the loan obligations. *Id.* at 19. The court found that First Commerce had "refused to register the vehicles in Keystone's name while their loan was outstanding" and "all Keystone [had been] required to do was to refinance the loan in their name to get title to the vehicles." *Id*.[4] The court concluded, "It does not seem proper under this agreement to declare EMStar as being at fault when efforts were made on their part to facilitate the assumption of loan obligations, by which Keystone could subsequently take title, and Keystone refused to accept said terms." *Id.* at 20.

The court also found that although EMStar had failed to provide a line of credit under Article 5.1, Keystone never provided EMStar with written notice that it was in default on this basis. *See id.* at 22-23.

Based on the foregoing, the court concluded that although Keystone had attempted termination under Article 10.1, claiming an uncured default by EMStar, EMStar had not defaulted, and therefore Article 4.2 governed the terms of the termination. *See id.* at 23. The court also held that Keystone's attempt to make the termination retroactive to February 2015 was ineffective. The court explained that because the parties continued to perform at least a part of their duties under the Agreement after February 2015, the termination

_____

[4] *See also* Trial Ct. Op. at 20 ("[EMStar] made it clear that taking title required Keystone to assume the refinancing obligation as the agreement implied and that Keystone was not interested in doing so").

was effective as of the date of the delivery of the letter, June 14, 2016. *See id.* at 16-17.

The court dismissed Count II, in which EMStar had alleged damages resulting from Keystone's breaches of the Agreement "through the present date," as moot.

On Count III, the other breach of contract claim, the court found Keystone was obligated to pay EMStar the $2 million Termination Payment because Keystone had terminated the Agreement without any default by EMStar. The court held that a post-judgment interest rate of 6% applied to this award.

The court also found Keystone had breached the Agreement by redirecting some of the facilities accounts receivable from the lockbox. It noted that although Keystone had alleged it did this with EMStar's consent, the Agreement required any modifications to be in writing and signed by both parties, and no such writing was in evidence. The court also found that Keystone had breached the agreement by withholding the gross monthly revenue payments after July 2015. However, the court found EMStar's calculations of the damages for these breaches were speculative and unreliable. The court found EMStar's calculation for damages credible as it related to the amounts Keystone had been required to pay towards the vehicle leases. But it found EMStar failed to present evidence "showing the amounts still due under these payments." *Id.* at 27.

The court dismissed Count IV, for unjust enrichment, as moot, finding it was precluded as a matter of law because the Agreement governed the dispute.

Both parties filed post-trial motions, which were denied as matter of law. *See* Pa.R.C.P. 227.4(b)(1). Keystone filed a praecipe for judgment in the amount of $2 million. Both parties appealed.[5]

**Keystone's Issues**

We will begin by addressing Keystone's issues, which are:

1. Did the [t]rial [c]ourt commit an error of law in concluding that [EMStar] could recover $2,000,000 in breach of contract damages where the [t]rial [c]ourt found that [EMStar] also breached the contract by failing to fulfill all of its own obligations under the Management Agreement by and between [EMStar] and [Keystone](the "Agreement")? . . .

2. Did the [t]rial [c]ourt commit an error of law by admittedly "implying" terms into an unambiguous Agreement and relying upon evidence that was never introduced at trial? . . .

3. Did the [t]rial [c]ourt commit an error of law where it placed the burden of proof on [Keystone] and based its legal conclusion upon clearly erroneous factual findings? . . .

4. Did the [t]rial [c]ourt commit [an] error of law and abuse its discretion in permitting [EMStar] to introduce evidence of good character and hearsay, while precluding [Keystone] from introducing rebuttal and impeachment evidence? . . .

5. Did the [t]rial [c]ourt commit an error of law and violate the coordinate jurisdiction rule when it permitted [EMStar] to

---

[5] The court entered an order in June 2023 purporting to deny all post-trial motions except for EMStar's motion for pre-judgment interest, which it purported to grant. By that time, however, the post-trial motions had already been denied as a matter of law, judgment had been entered, and this appeal had been taken. The court therefore lacked jurisdiction.

- 14 -

introduce damages evidence outside an audit report prepared by Heffler, Radetich & Saitta LLP in violation of a prior court order by a different judge, which limits [EMStar's] damages to that audit report? . . .

6. Did the [t]rial [c]ourt commit an error of law when it dismissed Counts II and IV as "moot" instead of dismissing those claims with prejudice based upon the [t]rial [c]ourt's findings? . . .

Keystone's Br. at 3-4.

We review these issues pursuant to the following standards.

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue concerns a question of law, our scope of review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

*Linde v. Linde*, 210 A.3d 1083, 1090 (Pa.Super. 2019) (quoting *Bank of N.Y. Mellon v. Bach*, 159 A.3d 16, 19 (Pa.Super. 2017)).

Furthermore, insofar as these issues require us to interpret a contract, which is a question of law, "we need not defer to the conclusions of the trial court and are free to draw our own inferences." *Stephan v. Waldron Elec. Heating & Cooling LLC*, 100 A.3d 660, 665 (Pa.Super. 2014) (citation omitted).

In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested

by the language of their written agreement. When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

*Id.* (citation omitted).

"[T]he entire contract should be read as a whole . . . to give effect to its true purpose." *Commonwealth ex rel. Kane v. UPMC*, 129 A.3d 441, 463-64 (Pa. 2015) (citation omitted). We must construe all provisions of an agreement together and give effect to each. *Lesko v. Frankford Hosp.-Bucks Cnty.*, 15 A.3d 337, 342 (Pa. 2011). We "will not interpret one provision of a contract in a manner which results in another portion being annulled." *Id.* (quoting *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647-48 (Pa. 2009)).

Issue 1

Keystone first argues that the court erred in finding for EMStar on its breach of contract claim when the court also found EMStar had breached Article 5.1 of the Agreement by failing to extend a line of credit to Keystone. According to Keystone, a party cannot maintain an action for breach of contract if that party has also failed to perform under that contract. Keystone alleges that whether it provided written notice of this default to EMStar pursuant to Article 10.1 is a separate issue from whether EMStar can satisfy the elements of its breach of contract claim.

Here, the Agreement provided that EMStar's breach of any duty under the contract would be a default warranting termination of the Agreement, but

- 16 -

only if Keystone provided EMStar with written notice "specifying the nature" of the default and EMStar did not cure the default within 10 days (or diligently commence to cure the default if it could not be cured within 10 days). *See* Article 10.1. While the Agreement obligated EMStar to provide Keystone a $1 million line of credit within 60 days of the Agreement's effective date, Keystone never provided EMStar with written notice that it considered EMStar's failure to fulfill this provision to be a default. Pursuant to the plain terms of the Agreement, EMStar's failure was not a default that would excuse Keystone from its contractual obligations.

Issue 2

Keystone next argues the court erred in concluding that EMStar was not in default for failing to transfer title to the St. Christopher's vehicles. Keystone asserts the court erroneously held the Agreement implied that Keystone was required to accept a refinancing agreement. According to Keystone, the Agreement unambiguously required EMStar to transfer title to all vehicles without requiring Keystone to do anything aside from assuming the loan obligations the Agreement identified. Keystone also argues the court erred in finding EMStar was only required to make "reasonable efforts" to transfer the titles. It maintains that the court erroneously applied the general language of Article 2.1 over the specific provision of Article 6.1(j), which required EMStar to transfer the titles. Keystone further argues that the court considered exhibits that were never introduced at trial, and that the admitted exhibits it cited in its opinion do not support its findings.

Keystone's second issue is meritless. The court did not imply terms into the Agreement or hold that Keystone was in breach for failing accept the terms of a refinancing agreement.[6] Rather, the court held that EMStar was not in default for failing to transfer the titles when the corresponding loans could not be reassigned and Keystone refused to take financial responsibility for the vehicles.

This was not error. Keystone stresses that Article 6.1(j) of the Agreement required EMStar to transfer title to all its vehicles to Keystone. **See** Article 6.1(j). Keystone would have the court enforce only that portion of the Article without giving effect to the rest of the Agreement. Yet that same provision, Article 6.1(j), required that title to the vehicles would transfer subject to the existing loans. **See id.** (requiring Keystone to "take title to . . . the Loaned Vehicles . . . subject to the . . . Vehicle Loans, as the case may be"). Another provision, Article 2.4, further specified that the outstanding loan amount was to become Keystone's responsibility. **See** Article 2.4. The court was required to give effect to each of these provisions, rather than enforce only the provision for title transfer without regard for the requirement that the loan go with the title. **See Lesko**, 15 A.3d at 342.

The court found that First Commerce refused to allow the loans for the two St. Christopher's vehicles to be assigned to Keystone, and the titles could not transfer until Keystone agreed to refinance the vehicles. Although the

---

[6] EMStar has not alleged Keystone was in breach for refusing to refinance the vehicles.

court cited some exhibits that had not been introduced into evidence, there was other, proper support for this finding in the record. For example, in its opinion, the court cites exhibits P-15 and P-43, which were e-mails between Keystone and EMStar about this issue. The court relied on Zupnik's testimony that First Commerce required its loan to be paid for title to transfer, and that Keystone had refused the accept a financing agreement that would have enabled the transfer. *See* Trial Ct. Op. on Post-Trial Motions, 7/3/23, at 6 (quoting N.T., 12/7/21, at 137-38). The court found this testimony credible. *See id.*

The failure to transfer the titles does not require a finding of default. Article 10.1 only provides for Keystone's termination of the Agreement when EMStar fails to fulfill a provision and does not diligently attempt to remedy the failure. *See* Article 10.1. Where "a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) Contracts, § 261; *see Davis v. Borough of Montrose*, 194 A.3d 597, 608 (Pa.Super. 2018). That EMStar could not transfer title to the vehicles subject to their existing loans was a supervening impracticability, not a default. The Agreement was silent on the remedy for an impracticability, except that it stated any unenforceable provisions of the Agreement would not affect the remainder of the Agreement. *See* Article 11.10. The court therefore did not err in concluding EMStar was

- 19 -

not in default under Article 10.1 for failing to fulfill Article 6.1(j). Nor did this impracticability otherwise provide grounds for termination, as both parties were able to continue substantially performing their other obligations under the Agreement.[7]

Nor did the court err in considering whether EMStar was in default for failing to make "reasonable efforts" to assist Keystone in transferring the titles. Both parties were required to take responsibility for ensuring the vehicle titles transferred. **See** Article 2.1. Had EMStar not made reasonable efforts to transfer title, despite the impossibility of fulfilling the exact terms of Article 6.1(j), the court might have found EMStar in default of Article 2.1 and termination proper under Article 10.1.

Instead, the court found that EMStar made reasonable efforts to arrange to have new loans created in Keystone's name, which would have allowed for the titles to transfers. The record supports the court's findings. We therefore affirm the finding that EMStar was not in default under either Article 2.1 or 6.1(j) for failing to transfer title to the St. Christopher's vehicles.

Issue 3

Keystone's third argument is that the court erred in concluding that EMStar had not defaulted by failing to transfer title to other vehicles, and that the court improperly shifted the burden of proof to Keystone to prove that the

---

[7] Because neither party alleges damages resulting from the other's failure to transfer title to the St. Christopher's vehicles or to refinance them, we need not decide what remedies would have been available had the parties made such claims.

titles never transferred. According to Keystone, EMStar bore the burden of proving it was not in default. Keystone asserts that because the court held that the record was not clear on whether EMStar ever transferred title to these vehicles, EMStar failed in its burden to prove breach of contract.

This argument has no merit. The court credited Zupnik's testimony that he provided the paperwork necessary to complete the title transfers, and that Keystone never alerted EMStar to any further issues. The court also considered the evidence that Keystone later informed EMStar that it considered EMStar's failure to transfer the St. Christopher's vehicles to be a material breach. The court surmised from these communications that the issues with the other vehicles had been resolved. This was a reasonable inference from the evidence. The court was free to rely on this evidence and disregard the bald testimony offered by Keystone asserting, in its defense, that the title issues of which it had complained in March 2014 persisted and were the grounds for its termination of the Agreement in June 2016.

Issue 4

Keystone's next issue is a cluster of challenges to the court's evidentiary rulings.

> The admissibility of evidence is within the sound discretion of the trial court, and we will not overturn its decisions in this regard absent an abuse of discretion or misapplication of law. We also do not reverse such a ruling unless the objecting party sustained prejudice. An abuse of discretion is not merely an error of judgment. It requires a showing of manifest unreasonableness, partiality, ill-will, or such lack of support as to be clearly erroneous. Under this standard, the party challenging the trial court's discretion on appeal bears a heavy burden.

*Kimble v. Laser Spine Inst., LLC*, 264 A.3d 782, 795 (Pa.Super. 2021) (cleaned up). "A party suffers prejudice when the trial court's error could have affected the verdict." *Reott v. Asia Trend, Inc.*, 7 A.3d 830, 839 (Pa.Super. 2010). However, "a court sitting as trier of fact is presumed to disregard inadmissible evidence and consider only relevant and competent evidence." *Conroy v. Rosenwald*, 940 A.2d 409, 417 (Pa.Super. 2007).

Keystone first argues the court abused its discretion in overruling its objection to EMStar's questioning of Zupnik about his work as a first responder on September 11, 2001. Keystone argues that evidence of a party's good character is irrelevant and inadmissible in a civil case under Pennsylvania Rule of Evidence 405.

No relief is due. The court stated that it did not consider the testimony as evidence of Zupnik's good character but as background to his career trajectory. Trial Ct. Op. on Post-Trial Mot. at 10. Even assuming the testimony was inadmissible, Keystone has not established prejudice. A court sitting as factfinder is presumed to disregard inadmissible evidence. *Conroy*, 940 A.2d at 417.

Keystone next argues the court abused its discretion in sustaining EMStar's objection to its questioning of Zupnik regarding his criminal history. Keystone argues it sought to elicit testimony that Zupnik while an owner of a nursing home had pleaded guilty in New York to a misdemeanor after staff cuts resulted in neglect and injury to the residents. Keystone asserts this was proper rebuttal to the good character evidence it claims EMStar presented.

The court did not abuse its discretion by disallowing the testimony. The court explained that it had not been swayed by any good character evidence such that rebuttal was warranted, and it found the criminal matter irrelevant. **See** Trial Ct. Op. on Post-Trial Mot. at 11-12. As the disallowed information would not have affected the verdict, Keystone has failed to establish prejudice.

Keystone also argues the court abused its discretion in precluding it from impeaching Zupnik in two ways. Keystone first attempted to impeach Zupnik with a memorandum of law that EMStar filed on another matter admitting that EMStar agreed to have the facilities accounts receivable redirected from EMStar's lockbox to Keystone's bank account.

Keystone offered this evidence to establish Zupnik's testimony on whether EMStar had agreed to allow the facilities accounts receivable to be diverted from the lockbox was not consistent with his testimony in the instant trial, and therefore not credible. However, the court did not grant EMStar any relief on its claim that Keystone diverted funds from the lockbox. We therefore do not find that impeaching Zupnik on this issue would have affected the verdict such that a new trial would be warranted.

Keystone also raises its attempted impeachment of Zupnik with his earlier testimony from the instant trial. It states that it only withdrew its question after the court repeatedly sustained EMStar's objection.

The trial court found this issue waived, and we agree. **See** Trial Ct. Op. on Post-Trial Mot. at 12-13. After the court sustained the objection, it offered counsel the opportunity to rephrase the question and paraphrase Zupnik's

prior testimony. Keystone's counsel then withdrew the question. ***See*** N.T., 2/1/22, at 126. In any event, Keystone has failed to prove prejudice. It has not asserted that it could not have confronted Zupnik with his paraphrased testimony, as the court suggested.

Keystone next argues that the court abused its discretion in precluding it from asking EMStar's executive director, Herman, who would know whether EMStar possessed title to the vehicles listed in the Agreement. Keystone asserts that it laid a proper foundation to show Herman would have known the answer. Keystone explains that Zupnik testified that Herman was the executive director and that he had attended a meeting between the parties on behalf of EMStar where the issue of titles to the vehicles was discussed. ***See*** Keystone's Br. at 57 (citing N.T., 2/1/22, at 112).

The court properly sustained the objection. When Keystone asked Herman whether EMStar had ever had title to certain vehicles, Herman testified, "I have no idea." N.T., 2/9/21, at 110. Zupnik's testimony that Herman attended a meeting on the issue does not establish Herman had personal knowledge of who else might have known the status of the vehicle titles. Moreover, even if the ruling was error, Keystone has failed to explain what the answer to the question would have proven, let alone how it was prejudiced.

Finally, Keystone argues the court abused its discretion in permitting Zupnik to testify that two facilities had informed EMStar that they had received

instructions to remit payment to an account being utilized by Keystone instead of the lockbox. Keystone argues this testimony was hearsay.

Even if the evidence constituted hearsay, Keystone has failed to prove prejudice. Keystone offered testimony admitting that it redirected the facilities accounts receivable from the lockbox. And, although the court found Keystone in breach for doing so, the court did not award EMStar any damages for this alleged breach.

Issue 5

Keystone argues the court violated the coordinate jurisdiction rule by permitting EMStar to introduce evidence of damages aside from those contained in an audit report. Keystone contends a different judge presiding over this case previously entered an order limiting damages to those contained in the report. Keystone argues the court erred when it overruled its trial objection to EMStar's introducing other testimony to support its claims for damages.

Keystone did not raise this issue in its post-trial motion, and it is therefore waived. **See Matthew 2535 Props., LLC v. Denithorne**, ____ A.3d ____, 2024 WL 1126110, at *6 (Pa.Super. filed Mar. 15, 2024) (*en banc*); Pa.R.C.P. 227.1.

In any event, it is meritless. The court entered an order granting Keystone's motion for summary judgment, in part, by dismissing EMStar's previous claim that Keystone breached the Agreement by failing to renew EMStar's ambulance certificate. **See** Order, 2/16/17, at 1. The same order

denied Keystone's request to dismiss EMStar's claim for breach of contract on the grounds that Keystone redirected funds from the lockbox. *Id.* In a footnote, the order stated, "[EMStar's] only evidence of damages for breach of contract, the audit . . ., does not even purport to establish any damages related to not renewing [EMStar's] Ambulance Certificate." *Id.* at n.1. The order was thus addressing proof of damages substantiating the claims related to the renewal of the ambulance certificate. It did not expressly preclude EMStar from presenting any other evidence of damages at trial.

Moreover, after entering the order granting summary judgment in part, the court granted EMStar's request to amend the complaint to add the claim that Keystone breached Article 4.2 by failing to make the Termination Payment. Order, 6/29/18, at 1. This order clearly allowed EMStar to pursue its claim for $2 million in damages pursuant to the terms of the Agreement.

Issue 6

Keystone's final issue is that the court erred in dismissing Counts II and IV as moot rather than dismissing them with prejudice. Keystone asserts that if this Court vacates the trial court's finding for EMStar on Count III, there could be "additional litigation on [Counts II and IV]." Keystone's Reply Br. at 39-40.

This issue fails. We are affirming the denial of relief on Count I, regarding which the trial court found that Keystone validly terminated the Agreement in 2016. As a result, no further litigation can proceed on Count II, which was in effect contingent on a finding in Count I that the Agreement was

still in effect. As for Count IV, the trial court properly found that moot because it claimed unjust enrichment, and the court granted relief on the contract claim in Count III. As we have affirmed the grant of relief on Count III, we fail to see how additional litigation could proceed on Count IV.

**EMStar's Cross-Appeal**

EMStar's cross-appeal presents one question: "Should this Court mold the December 6, 2022 trial court order in EMStar's favor to include prejudgment interest, as Pennsylvania law requires?" EMStar's Br. at 3. EMStar argues that 6% pre-judgment interest is mandatory in Pennsylvania where the sum due is clear from the terms of the contract. It asks us to mold the $2 million judgment to include prejudgment interest from the date of termination.

Keystone counters that EMStar is not entitled to pre-judgment interest because the Agreement did not specify an amount due for termination without cause. Keystone asserts that the Agreement provided that the termination fee would be the greater of $2 million or "an amount equal to the sum of the highest consecutive three (3) Monthly Gross Revenue Payments paid by [Keystone] to [EMStar] during the twelve (12) month period preceding [Keystone's] notice of termination multiplied by twenty[-]four (24)." ***See*** Article 4.2. Keystone asserts that the court only ordered it to pay $2 million because EMStar did not provide any evidence of the latter sum.

On the matter of prejudgment interest in a contract case, Pennsylvania follows the Restatement (Second) of Contracts § 354. ***Krishnan v. Cutler Grp., Inc.***, 171 A.3d 856, 874 (Pa.Super. 2017). Section 354 provides,

> (1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.
>
> (2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

Rest. (2nd) of Contracts § 354.

A plaintiff is entitled to prejudgment interest as a matter of right when the contract requires payment of a monetary amount defined in, or ascertainable by, the contract's terms. ***Krishnan***, 171 A.3d at 874 (citing ***Cresci Constr. Servs., Inc. v. Martin***, 64 A.3d 254, 265 (Pa.Super. 2013)). The contract must be specific enough "such that at the time of the breach, the breaching party can proffer a tender." ***Id.*** at 875 (quoting ***Cresci Const. Servs., Inc.***, 64 A.3d at 265). The rule applies even if the contract requires the parties to ascertain the amount due using extrinsic evidence. ***Id.*** (citing Rest. (2nd) of Contracts § 354, cmt. c). Moreover, "no exception to the right to prejudgment interest has been recognized simply because the amount of damages must be determined at trial." ***Widmer Eng'g, Inc. v. Dufalla***, 837 A.2d 459, 469 (Pa.Super. 2003).

Here, the Agreement was sufficiently definite to allow Keystone to proffer a tender at the time it terminated the contract. The Agreement

provided that upon termination without cause, Keystone was to pay EMStar the greater of $2 million or a sum equal to 24 times the highest three consecutive monthly gross revenue payments paid during the preceding 12 months. The Agreement further defined monthly gross revenue payments. The trial then established that Keystone had stopped making these payments to EMStar in July 2015, such that the highest three consecutive payments in the 12 months preceding the June 2016 termination was less than $2 million. Because the Agreement was sufficiently definite and the amount due was ascertainable by Keystone, EMStar is due prejudgment interest as a matter of right.

Keystone also argues that that prejudgment interest does not begin to run until the plaintiff demands payment of the underlying amount owed, and that here, EMStar did not demand payment of the $2 million termination fee until it filed the Second Amended Complaint. Keystone's Reply Br. at 42. It therefore argues that any pre-judgment interest should run from the date EMStar filed the Second Amended Complaint, and not the date of the termination. It also asserts it should not be penalized for the length of litigation.

Prejudgment interest begins to run when performance is due, regardless of whether the plaintiff demanded prejudgment interest prior to commencing litigation. *Allegheny Energy Supply Co., LLC v. Wolf Run Mining Co.*, 53 A.3d 53, 65 (Pa.Super. 2012); Rest. (2nd) of Contracts § 354(1). As prejudgment interest is a legal right, it "must be awarded despite the good

faith of the party contesting the claim." ***Andrews v. Cross Atl. Capital Partners, Inc.***, 158 A.3d 123, 136 (Pa.Super. 2017).

We therefore hold that prejudgment interest should run from the date the trial court found that Keystone terminated the Agreement without cause: June 14, 2016. We accordingly vacate the judgment and remand for the trial court to calculate prejudgment interest. ***See Portside Invs., L.P. v. N. Ins. Co. of New York***, 41 A.3d 1, 15 (Pa.Super. 2011).[8]

Judgment vacated. Case remanded for proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/31/2024

---

[8] ***See also Carter v. Consol Pa. Coal Co.***, No. 1196 WDA 2017, 2018 WL 5850132, at *14 (Pa.Super. Nov. 8, 2018) (unpublished mem.).